IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PERNIX SLEEP, INC., *et al.*[1] | Case No. 19-10323 (   ) |
| Debtors. | Joint Administration Requested |

### DECLARATION OF JOHN A. SEDOR IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

John A. Sedor declares and says:

1.      I am Chief Executive Officer and Chairman of the Board of Directors (the "Board") of Pernix Therapeutics Holdings, Inc. ("Pernix"). I have served as Pernix's Chief Executive Officer and as Chairman of the Board since July 2016 and as a member of the Board since March 2014. Prior to July 2016, I served as Chairman of the Board and Interim Chief Executive Officer since May 2016. I have also been Chairman and Chief Executive Officer of SEDOR Pharmaceuticals, LLC, a company unrelated to Pernix, since 2014. Prior to joining Pernix, I served as President, Chief Executive Officer and a director of Cangene Corporation, a fully integrated developer and manufacturer of immune therapeutics, from 2011 until its acquisition by Emergent Biosolutions in February 2014. Prior to that, from 2008 until 2011, I served as President and Chief Executive Officer of CPEX Pharmaceuticals ("CPEX") after its 2008 spin-off from Bentley Pharmaceuticals, Inc. ("Bentley") and until its 2011 acquisition by

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, are: Pernix Therapeutics Holdings, Inc. (4736), Pernix Therapeutics, LLC (1128), Pernix Manufacturing, LLC (1236), Pernix Sleep, Inc. (1599), Cypress Pharmaceuticals, Inc. (1860), Hawthorn Pharmaceuticals, Inc. (2769), Macoven Pharmaceuticals, L.L.C. (4549), Gaine, Inc. (3864), Respicopea, Inc. (1303), Pernix Ireland Limited (3106PH), Pernix Ireland Pain Designated Activity Company (0190LH), Pernix Holdco 1, LLC (N/A), Pernix Holdco 2, LLC (N/A), Pernix Holdco 3, LLC (N/A). The Debtors' corporate headquarters and mailing address is 10 North Park Place, Suite 201, Morristown, NJ 07960.

Footstar, Inc.  I was President of Bentley from 2005 until its spin-off of CPEX.  From 2001 to May 2005, I was President and CEO of Sandoz, Inc. (a division of Novartis AG).  From 1998-2001 I was President and Chief Executive Officer at Verion, Inc., a drug delivery company. Previously, I served as President and Chief Executive Officer at Centeon, LLC, a joint venture between two major multinational corporations, Rhône-Poulenc Rorer and Hoechst AG and as Executive Vice President at Rhône-Poulenc Rorer, Revlon Health Care and Parke-Davis.  I hold a bachelor of science degree in pharmacy/chemistry from Duquesne University, and have studied strategic marketing at both Northwestern University's Kellogg Graduate School of Management and Harvard Business School.  I have also attended Harvard's Executive Forum.  I am familiar with the day-to-day operations, business and financial affairs of the Debtors (as defined below).

2.      I submit this declaration (i) in support of the petitions of the Debtors for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code"), (ii) in support of the Debtors' petitions and contemporaneously-filed requests for relief in the form of motions and applications (collectively, the "First Day Motions") and (iii) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of the above-captioned chapter 11 cases (the "Chapter 11 Cases").  I have reviewed the First Day Motions, and it is my belief that the relief sought therein on an expedited basis is essential to the uninterrupted operation of the Debtors' business and to the Debtors' reorganization.

3.      Except as otherwise indicated, all facts set forth in this declaration (this "Declaration") are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors and the

2

pharmaceutical industry as a whole.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis.  I am authorized by the Debtors to submit this Declaration.

**Commencement of Bankruptcy Proceedings**

4.        On the date hereof, (the "Petition Date"), Pernix and its direct and indirect subsidiaries that are debtors and debtors-in-possession in the Chapter 11 Cases (collectively, the "Company" or the "Debtors"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.        The Debtors commenced the Chapter 11 Cases in order to pursue the sale of all or substantially all of their assets pursuant to section 363 of the Bankruptcy Code (the "Section 363 Sale").  Prior to the Petition Date, and following a thorough and competitive marketing process and arm's-length negotiations with the Debtors' significant secured creditor constituencies and thorough exploration of proposals from potential third-party bidders, the Debtors determined that a stalking horse bid (the "Stalking Horse Bid") from Phoenix Top Holdings LLC (the "Stalking Horse Bidder"), a company formed and capitalized by certain funds managed by Highbridge Capital Management, LLC ("Highbridge"), which are also the Debtors' Prepetition ABL Lenders and Prepetition DDTL Lenders and the holders of 100% in principal face amount of the Prepetition Exchangeable Notes and, to the best of the Company's knowledge, the Prepetition

Treximet Notes[2] (each as defined below), represented the best available path to a value-maximizing transaction.  The Stalking Horse Bid includes an offer to purchase significantly all of the Debtors' assets for an aggregate purchase price composed of cash and credit bid consideration of approximately $75.6 million plus the assumption of certain liabilities (the "Purchase Price") on the terms and conditions set forth in that certain Asset Purchase Agreement, dated as of February 18, 2019, by and among the Debtors and the Stalking Horse Bidder (the "Stalking Horse APA").[3]  As described in further detail in the Sale Procedures Motion, to ensure that the Stalking Horse Bid is in fact the highest or otherwise best offer for the purchase of the Debtors' assets, the Debtors have developed bidding and auction procedures (the "Sale Procedures") that will allow interested parties to submit competing bids for the Debtors' assets.

6.      To preserve and maximize the value of their assets, proceeding through their Chapter 11 Cases expeditiously is critical to the Debtors.  As set forth in greater detail below, the Debtors conducted a fulsome prepetition marketing process involving outreach to over seventy (70) parties and also engaged in discussions with each of their secured creditor constituencies, during which time the Debtors made clear to all potentially interested parties that they were receptive to any value-maximizing strategic transaction, whether in the form of a sale, restructuring, financing or otherwise, either in or out of court.  Given the scope of the pre-

---

[2] On February 18, 2019, Highbridge agreed to purchase all of the Prepetition Treximet Notes held by the Trex Group (as defined below) as of such date.

[3] A copy of the Stalking Horse Agreement is attached as Exhibit B to the *Motion of Debtors for Entry of Orders (1)(a) Approving Sale Procedures for Sale of Debtors' Assets, (b) Approving Stalking Horse Protections, (c) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (d) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (e) Approving Assumption and Assignment Procedures and (f) Granting Related Relief and (II)(a) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (b) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases and (c) Granting Related Relief* (the "Sale Procedures Motion"), filed contemporaneously herewith.

petition marketing process and the fact that the parties that engaged in this process are already familiar with the Debtors and their assets, it is unlikely that any parties participating in the post-petition sale process will require a large amount of time to formulate a competing bid. The Debtors have therefore proposed the following timeline for their sale process, which is unlikely to have a negative impact on the Debtors' ability to achieve a value maximizing sale and appropriately balances the Debtors' desire to conduct a robust sale and auction process with the need to consummate a transaction as quickly as practicable to preserve the value of their assets and business:

| Event | Date |
|---|---|
| Entry of Sale Procedures Order | On or about March 13, 2019 |
| Bid Deadline | March 25, 2019 at 5:00 p.m. (Prevailing Eastern Time) |
| Auction (if necessary) | April 1, 2019 at []:00 [].m. (Prevailing Eastern Time) |
| Sale Hearing | April 8, 2019 at []:00 [].m. (Prevailing Eastern Time) |

7.     The Company intends to work with the official committee of unsecured creditors once it is appointed to gain its support for the expedited sale timeline proposed above. The Company understands that committee support is likely required to proceed on the expedited timeline set forth above because the Stalking Horse Bid contemplates a credit bid of prepetition secured claims. In the alternative, the Company is prepare to conduct a sale and auction process as quickly as possible in accordance with the timeline set forth below:

| Event | Date |
|---|---|
| Entry of Sale Procedures Order | On or about March 13, 2019 |
| Bid Deadline | April 12, 2019 at 5:00 p.m. (Prevailing Eastern Time) |

| Auction (if necessary) | April 19, 2019 at []:00 [].m. (Prevailing Eastern Time) |
| Sale Hearing | May 3, 2019 at []:00 [].m. (Prevailing Eastern Time) |

8.      Section I of this declaration describes the Debtors' businesses; Sections II and III describe the Debtors' prepetition restructuring initiatives and the circumstances giving rise to the commencement of these Chapter 11 Cases; and Section IV sets forth the relevant facts in support of the First Day Motions.

## I.

### The Debtors' Business

**A.      The Debtor's Business**

9.      Pernix is a specialty pharmaceutical company focused on improving patients' lives by identifying, developing and commercializing differentiated products that address unmet medical needs.  The Debtors' products target underserved market segments, such as central nervous system indications, including neurology and pain, as well as other specialty therapeutic areas.

10.      The Debtors' primary sales channel is through wholesalers, who sell the Debtors' products to retail drug stores, mass merchandisers and grocery store pharmacies in the U.S., who, in turn, sell the medications to customers.  The Debtors also sell products to members of group purchasing organizations, and certain customers also purchase the Debtors' products directly through the Pernix Prescriptions Direct program, which provides the Debtors' products to commercially insured customers through mail-order pharmacies at discounted rates.

11.      Primarily, the Debtors sell three core branded products: Zohydro® ER with BeadTek™ ("Zohydro"), Silenor® ("Silenor"), and Treximet® ("Treximet").  Zohydro is an extended-release opioid for the management of severe pain, which—unlike its competitors—

6

does not contain acetaminophen, reducing the risk for potential liver toxicity, and which is specifically designed to deter opioid abuse. Silenor is the only non-narcotic, non-scheduled and non-addictive FDA-approved prescription sleep aid for the treatment of insomnia characterized by difficulty with sleep maintenance. Finally, Treximet is the only FDA-approved acute migraine treatment combining two traditional migraine treatments to produce a unique synergistic therapeutic effect that provides superior sustained pain relief through its rapid release technology called RT Technology$^{TM}$. In 2018, approximately 31% of the Company's consolidated net product revenues were attributable to Zohydro, 27% were attributable to Silenor and 22% were attributable to the branded Treximet product. The Debtors also market a generic drug portfolio, consisting of the authorized generic version of Treximet, dietary supplements, medical foods and other products, through Macoven Pharmaceuticals, LLC ("Macoven") and Cypress Pharmaceuticals, Inc. ("Cypress"); this generic drug portfolio represented 20% of consolidated net revenues in 2018.

12.    Historically, Pernix's business model has focused on broadening its product portfolio through the acquisition of marketed specialty products or products close to achieving regulatory approval. In August 2014, the Company acquired the U.S. intellectual property rights to Treximet from GlaxoSmithKline for $267 million. In April 2015, the Company acquired the Zohydro product line from Zogenix, Inc. for upfront consideration consisting of $80 million of cash and 168,209 shares of Pernix common stock, plus certain contingent regulatory and commercial milestone payments of up to $283.5 million. Other significant acquisitions are those of Pernix Sleep, Inc. ("Pernix Sleep"), including Silenor, in 2013 and Cypress, the Company's generic product distributor, in 2012.

13.    In July 2018, Pernix Ireland Pain Designated Activity Company ("PIP DAC") acquired 10% of the equity in Nalpropion Pharmaceuticals, Inc. ("Nalpropion") for $7.35 million, plus an incremental $1.82 million contribution for working capital requirements, which was funded via the Prepetition DDTL Facility (as defined below). Nalpropion was formed by the Debtors, certain Highbridge affiliates and co-investors to acquire certain assets of Orexigen Therapeutics, Inc., including worldwide rights to Contrave® ("Contrave"), a prescription-only weight loss medication. Pursuant to the Services Agreement, dated as of July 27, 2018 (as amended by Amendment No. 1 to Services Agreement, dated as of December 18, 2018, and Termination of Certain Services and Amendment No. 2 to Services Agreement, dated as of January 6, 2019, the "Services Agreement") between Nalpropion and Pernix Therapeutics, LLC ("Pernix Therapeutics), the Debtors are responsible for performing certain management and oversight services for Nalpropion. In addition, the Debtors are currently responsible for distributing Contrave in the United States under the Transitional Distribution Services Agreement, dated as of January 6, 2019 (the "TSA"), between Nalpropion and Pernix Therapeutics. Pernix Therapeutics receives a management fee under the Services Agreement and TSA equal to 5% of net sales of Contrave. The Company also has options to acquire up to 49.9% and 100% of Nalpropion at specified future times and purchase prices.

14.    Under the Services Agreement, on a monthly basis Pernix Therapeutics earns approximately $415,000 in management fees on account of its right to receive 5% of net sales of Contrave. Since Nalpropion was established, Pernix Therapeutics has earned a total of $2,073,906.55 in such management fees from August 2018 through December 2018 as well as receiving expense reimbursement from Nalpropion for Pernix's overhead costs of $1,945,833.82 in total.

**B.      The Debtors' Finances and Employees**

15.      For the twelve months ended December 31, 2018, Pernix recorded consolidated net revenue of approximately $138.7 million.  Excluding revenue related to Nalpropion, consolidated net revenue for 2018 was approximately $92.4 million, which represents approximately a 37% decrease from total consolidated 2017 net revenue. The year-over-year decline is largely attributable to the loss of patent exclusivity of Treximet in February 2018 and resulting generic competition together with the discontinuation of certain products, including IDA (as defined below) and desvenlafaxine.  For the twelve months ended December 31, 2018, the Company posted a loss from operations of approximately $3 million on a consolidated basis.

16.      Crucial to the distribution of the Debtors' unique suite of products, the Debtors currently employ a talented and dedicated workforce of thirty (30) people in active status working full-time positions, including executives, business managers, human resource professionals, information technology specialists, administrative support staff and other personnel, who have enabled the Debtors to continue to achieve their goals of improving patients' lives.  The Debtors' employees live and work primarily in New Jersey.  None of the Debtors' employees are represented by a union.

17.      On February 15, 2019, Pernix committed to and commenced a reduction in force of approximately eighty-nine (89) employees, consisting of seventy-four (74) geographically dispersed employees, principally sales force, and fifteen (15) employees at its corporate headquarters.

**C.      Corporate Structure**

18.      Pernix is the direct or indirect parent company of each of the Debtors.  Pernix's common stock is publicly traded on the Nasdaq Global Market under the symbol "PTX".  The

Company is headquartered in Morristown, New Jersey. The Company holds certain assets, including IP-related assets, owned in connection with the Treximet and Zohydro products in entities incorporated in Ireland (Pernix Ireland Limited ("PIL") and PIP DAC, respectively). PIL and PIP DAC maintain offices in Dublin, Ireland. In addition, Pernix, through PIP DAC, owns a 10% interest in non-Debtor Nalpropion.

**D.    Capital Structure[4]**

19.    Pernix files annual reports with, and furnishes other information to, the Securities and Exchange Commission. As of the Petition Date, there were approximately 17,347,048 shares of Pernix's common stock issued and outstanding.

*i.    The Prepetition ABL*

20.    Pernix, Pernix Therapeutics, Pernix Sleep, Cypress, Macoven, Hawthorn Pharmaceuticals, Inc. ("Hawthorn"), Gaine, Inc. ("Gaine"), and Respicopea Inc. ("Respicopea") are each borrowers (the "ABL Borrowers") under that certain Credit Agreement, dated as of July 21, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition ABL Credit Agreement"), by and among the ABL Borrowers, PIL, PIP DAC, Pernix Holdco 1, LLC, Pernix Holdco 2, LLC, and Pernix Holdco 3, LLC, as Guarantors, certain funds managed by Highbridge, as lenders (the "Prepetition ABL Lenders"), and Cantor Fitzgerald Securities, as Administrative Agent (the "Prepetition ABL Agent"). As of the Petition Date, approximately $14.1 million in principal amount remains outstanding under the Prepetition ABL Credit Agreement. Obligations arising under the Prepetition ABL Credit Agreement are secured by, among other things, first priority liens on and security interests in cash and cash

---

[4] The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules and exhibits.

equivalents, inventory and accounts receivable of the ABL Borrowers. Under the Prepetition ABL Credit Agreement, the ABL Borrowers are required to deliver monthly borrowing base certificates to the Prepetition ABL Agent that, among other things, set forth (1) the ABL Borrowers' calculations regarding the value of the portion of the collateral for the Prepetition ABL Credit Agreement that constitutes eligible accounts receivable and eligible inventory, and (2) the borrowing base for such eligible collateral against which the ABL Borrower may draw revolving loans under the Prepetition ABL Credit Agreement. The most recent borrowing base certificate delivered by the ABL Borrowers prior to the Petition Date reflected eligible accounts receivable and eligible inventory values of $14.8 million and $10.8 million, and a borrowing base amount of approximately $25.6 million. Such calculations do not reflect the values of all of the ABL Borrowers' assets that are subject to liens securing the Prepetition ABL Credit Agreement. Cash collateral is not reflected in such borrowing base calculations. Additionally, the ABL Borrowers' accounts receivable and inventory are included as collateral for the Prepetition ABL Credit Agreement, regardless of whether or not such assets are eligible assets for purposes of being included in borrowing base calculations.

      *ii.    The Delayed Draw Term Loan*

21.    PIP DAC, as borrower, is party to that certain Credit Agreement, dated as of July 21, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition DDTL Credit Agreement"), by and among PIP DAC, certain funds managed by Highbridge, as lenders (the "Prepetition DDTL Lenders"), and Cantor Fitzgerald Securities, as Administrative Agent (the "Prepetition DDTL Agent"). As of the Petition Date, approximately $39.2 million in principal amount plus an additional $1.1 million of accrued pay-in-kind interest remains outstanding under the Prepetition DDTL Credit Agreement. Obligations arising under

the Prepetition DDTL Credit Agreement are secured by, among other things, first priority liens

on and security interests in substantially all assets of PIP DAC, including assets relating to

Zohydro, PIP DAC's equity interests in Nalpropion and cash held by PIP DAC.

<em>iii.    The Prepetition Treximet Notes</em>

22.    In August 2014, Pernix issued $220.0 million in aggregate principal amount of

12% senior secured notes (the "<u>Prepetition Treximet Notes</u>") under that certain Indenture, dated

as of August 19, 2014, among Pernix, as Issuer, the Guarantors party thereto, and U.S. Bank

National Association, as Trustee and Collateral Trustee (the "<u>Prepetition Treximet Notes</u>

<u>Trustee</u>") (as amended, restated, supplemented or otherwise modified from time to time, the

"<u>Prepetition Treximet Notes Indenture</u>").  Interest on the Prepetition Treximet Notes is payable

on February 1 and August 1 of each year, and the Issuer is also required to pay an installment of

principal of the Prepetition Treximet Notes in an amount equal to 50% of Net Sales (as defined

in the Prepetition Treximet Notes Indenture) of Treximet for the two consecutive fiscal quarters

ended prior to each payment date (less the amount of interest paid on the Prepetition Treximet

Notes on such payment date).

23.    On August 1, 2018, Pernix announced a series of transactions pursuant to which

certain holders of the Prepetition Treximet Notes exchanged $12.2 million of Prepetition

Treximet Notes for a combination of Pernix common and preferred equity.

24.    As of the Petition Date, approximately $154 million in aggregate principal

amount of the Prepetition Treximet Notes remain outstanding.  The Prepetition Treximet Notes

are secured by a continuing first-priority security interest in substantially all of the assets of

Pernix and the Guarantors party to the Prepetition Treximet Notes Indenture related to Treximet

12

other than inventory and certain inventory related assets, including accounts arising from the sale of the inventory.

   *iv.* *The Convertible Notes*

  25. In April 2015, Pernix issued $130.0 million in aggregate principal amount of 4.25% Convertible Senior Notes due 2021 (the "Prepetition Convertible Notes") under that certain Indenture, dated as of April 22, 2015, between Pernix and Wilmington Trustee, National Association, as Trustee (the "Prepetition Convertible Notes Trustee") (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Convertible Notes Indenture"). The Prepetition Convertible Notes are unsecured and are not guaranteed by any party. As of the Petition Date, approximately $78 million in aggregate principal amount of the Prepetition Convertible Notes remain outstanding.

   *v.* *The Exchangeable Notes*

  26. On July 20, 2017, each of the Debtors entered into an exchange agreement (the "Exchange Agreement") with certain funds managed by Highbridge that were holders of the Prepetition Convertible Notes pursuant to which $51.8 million of aggregate principal amount of Prepetition Convertible Notes held by such holders were exchanged for (i) $36.2 million aggregate principal amount of 4.25%/5.25% Exchangeable Senior Notes due 2022 (the "Prepetition Exchangeable Notes") issued by PIP DAC pursuant to that certain Indenture, dated as of July 21, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Exchangeable Notes Indenture") among PIP DAC, the guarantors party thereto and Wilmington Trust, National Association, as Trustee (the "Exchangeable Notes Trustee") and (ii) 1,100,498 shares of common stock of Pernix. The Prepetition Exchangeable Notes are unsecured and are guaranteed by all of the Debtors (other than PIP DAC). As of the

Petition Date, approximately $35 million in aggregate principal amount of the Prepetition

Exchangeable Notes remain outstanding.

<i>vi.     Intercompany Obligations</i>

27.     In August 2014, the corporate predecessor of PIL issued a $225 million

promissory note to Pernix (the "Treximet Intercompany Note"). The proceeds from the issuance

of the Treximet Intercompany Note were used by PIL to acquire the Treximet assets. Interest

payable at 8% per annum and the principal amount outstanding on the Treximet Intercompany

Note is due on August 19, 2020. The Treximet Intercompany Note is unsecured and not

guaranteed by any party. As of December 31, 2018, approximately $294.75 million in aggregate

principal amount and interest remain outstanding under the Treximet Intercompany Note.

Additionally, in the ordinary course of business, the Debtors maintain relationships with each

other that result in intercompany claims arising from various intercompany transactions,

including, but not limited to, certain inventory transactions. These transactions are recorded in

the Debtors' books and records. Specifically, Treximet, Treximet Pediatrics, Treximet AG, and

Zohydro are acquired by the Debtors' Irish entities (PIL and PIP DAC) and, in turn, sold to

certain Debtor entities in the U.S.

**II.**

**<u>Events Leading to the Chapter 11 Cases</u>**

28.     The Company has been actively seeking a long-term solution for its capital

structure for some time. In order to consummate the acquisitions of Treximet and Zohydro in

2014 and 2015, respectively, the Company incurred significant indebtedness, including the

Prepetition Treximet Notes and the Prepetition Convertible Notes. Due to a number of factors,

including, but not limited to, net pricing and market dynamics in their respective therapeutic

areas, these products have underperformed relative to expectations, rendering the Company

14

overleveraged.  As a result, in July 2016, the Company announced the reorganization of its senior management team and, shortly thereafter, commenced of a formal process to review its strategic alternatives, including refinancing alternatives, asset sales and the sale of all or a portion of the Company.  In October 2016, certain holders of the Prepetition Treximet Notes and Prepetition Convertible Notes agreed to enter into non-disclosure agreements with Pernix in order to facilitate discussions concerning a possible consensual restructuring of Pernix's capital structure.  Over the following two-plus months, the parties exchanged numerous proposals and participated in negotiations.  Notwithstanding these efforts, the Company and the noteholder group were unable to reach an agreement.  On December 26, 2016, negotiations with this group ceased.

29.     On January 31, 2017, an arbitration tribunal issued its opinion in favor of Glaxo Group Limited, GlaxoSmithKline LLC, GlaxoSmithKline Intellectual Property Holdings Limited, and GlaxoSmithKline Intellectual Property Management Limited (collectively, "GSK"), awarding it damages and fees against Pernix and PIL in the amount of $35 million, plus interest, pertaining to litigation that arose from certain liabilities associated with the Treximet acquisition. As of the ruling date, Pernix had already paid to GSK, or into an escrow account, an aggregate of $16.5 million, resulting in a net outstanding liability of $18.5 million.  As a result of the ruling, Wells Fargo Bank, National Association ("Wells Fargo"), as Administrative Agent under the Company's $50 million asset-based revolving credit facility (the "Wells Fargo Facility"), communicated to the Company that it intended to create a reserve against the Company's borrowing base, which would potentially have triggered an event of default under the facility. On April 18, 2017, the Company and Wells Fargo agreed to an amendment to the Wells Fargo Facility that, among other things, reduced the lenders' commitments thereunder to the amount of

loans outstanding as of the date of the amendment and advanced the maturity date of the Wells

Fargo Facility from August 21, 2018 to July 31, 2017.

30.    Facing the near-term maturity of the Wells Fargo Facility, the Company

redoubled its efforts to engage with its stakeholders and considered various strategic and

refinancing alternatives.  In early 2017, the Company conducted an asset sale exploration process

that included contacting over one hundred (100) potentially interested parties.  In parallel, the

Company continued to explore potential solutions with its existing creditors.  In early May 2017,

Highbridge, which was (through certain affiliated funds) a significant holder of the Prepetition

Convertible Notes, agreed to enter into a non-disclosure agreement and participate in discussions

with the Company.  Following extensive, arms'-length negotiations, on July 20, 2017, the

Company and Highbridge announced several financing transactions, which included the

refinancing of the Wells Fargo Facility with the Prepetition ABL Credit Agreement, entry into

the Prepetition DDTL Credit Agreement and the issuance of approximately $36.2 million

aggregate principal amount of Prepetition Exchangeable Notes and 1,100,498 shares of Pernix's

common stock to Highbridge in exchange for Highbridge's tender of $51.8 million aggregate

principal amount of Prepetition Convertible Notes.  PIP DAC borrowed $30 million under the

Prepetition DDTL Credit Agreement at closing, and the Prepetition DDTL Lenders committed to

lend an additional $15 million in the future for certain specified purposes, including to finance

certain acquisitions.  In addition, Pernix and PIL contemporaneously entered into an amended

settlement agreement with GSK, pursuant to which Pernix and PIL would be obligated to make

payments totaling $6.65 million, plus certain payments in the event that Pernix redeemed,

repurchased, or exchanged Prepetition Convertible Notes at greater than 31.00 cents for every

one dollar of such notes outstanding, in satisfaction of the remaining approximately $21.2 million unpaid portion of the amount owing to GSK.

31.    Upon closing the refinancing transactions and entry into the amended settlement with GSK, the Company expected to have sufficient liquidity through the end of 2019 and access to capital to continue to pursue its strategy for future growth, which involved growing or maintaining sales of the existing products in its portfolio and acquiring additional marketed specialty products or products close to regulatory approval to leverage its existing platform.

32.    However, in late 2017 and into early 2018, the Company was confronted with the loss of two of the largest products in its generics portfolio.  First, the Company, through Macoven, distributed a combination product called isometheptene mucate, dichlorphenazone, and acetaminophen, ("IDA"), which was originally approved in 1948 by the FDA, for safety only.  IDA's efficacy as an adjunct treatment for peptic ulcer disease, as well as other medical conditions, such as migraine headaches, was reviewed under the FDA's Drug Efficacy Study Implementation ("DESI") process, DESI notice 3265.  The Company received a letter from the FDA dated October 19, 2017, asserting that any drug products identified in DESI 3265, including IDA, require an approved new drug application ("NDA") or an abbreviated new drug application ("ANDA") in order for them to continue to be distributed.  Since the Company had not obtained an NDA or ANDA for IDA, the FDA directed that it should cease distribution of IDA.  While IDA has a long history of safe use, the Company complied with the FDA's request. Second, in December 2017, Pernix was notified by Osmotica Pharmaceutical Corp. ("Osmotica") that the manufacturer that it had contracted with to manufacture KHEDEZLA™ (desvenlafaxine) tablets destroyed all of Pernix's desvenlafaxine Active Pharmaceutical Ingredient ("API") without consent.  Pernix then learned that its API supplier no longer manufactured this material

and did not intend to resume production. Neither Pernix or Osmotica were able to identify an alternative source of suitable API, and as a result Pernix proceeded to discontinue the product. For the year ended December 31, 2017, the Company's net sales from the sale of these two products were approximately $18 million in the aggregate, or approximately 12% of total net sales. Losing this revenue stream had a significant impact on the Company's business and operating cash flow in 2018.

33.     In addition, 2018 proved to be more challenging than expected due to issues relating to Treximet and Zohydro. With respect to Treximet, four patents covering Treximet expired in February 2018, enabling up to three generic competitors to enter the market. In anticipation of the impending loss of exclusivity for Treximet, the Company frequently convened a task force throughout 2017 dedicated to the commercialization of the authorized generic version of Treximet. That task force developed certain assumptions regarding the pricing for a generic version of Treximet as well as how managed care organizations would treat the branded version of Treximet within their contracts and rebate programs once generic versions of Treximet were available.

34.     The launch of generic versions of Treximet by third parties did not proceed as expected in certain key respects. The Company anticipated three generic entrants shortly after the expiration of the Treximet patents in February 2018. In fact, only one competitor promptly entered the market in February 2018, while the two others did not launch until August 2018. However, the first entrant came to market with a much lower price than anticipated, which dramatically impacted Pernix's ability to profitably market its own generic version of Treximet. The effects of the lower than expected generic price were compounded by the fact that, because there were only two generics for Treximet (the third-party product and Pernix's authorized

generic), managed care organizations did not adjust the maximum allowable cost of the branded

Treximet product in April as expected, forcing the Company to pay higher rebates until late

2018. These rebates on the branded product, plus the lower than expected generic price, resulted

in significantly lower than anticipated profitability for the Treximet franchise in 2018.

35.     Regarding Zohydro, a key threat arose during 2018 that compromised the

integrity of the intellectual property supporting market exclusivity of the product. On August 27,

2018, the United States District Court for the District of Delaware determined, in Pernix's

litigation against Alvogen Malta Operations, Ltd. ("Alvogen"), that two patents relating to

Zohydro are invalid. As a result, absent a reversal of the decision on appeal, pursuant to a

previous settlement agreement dated September 29, 2016, between Alvogen and Recro

Gainsville LLC, Alvogen will be able to launch a generic version of Zohydro, subject to final

approval of an Abbreviated New Drug Application by the Food and Drug Administration, as

early as October 1, 2019.

36.     Due to the culmination of the events in late 2017 and 2018, the Company's ability

to enter into strategic transactions (notwithstanding the Nalpropion transaction), such as

marketing and sales partnerships, and to access additional liquidity and the capital markets were

significantly constrained. Without the ability to expand its business inorganically or enter into

partnerships, the Company initiated a strategic operational review, including a potential

reduction in the size of its sales force. In addition, the Company recognized that, given its

current product mix and scale, it would be difficult to continue to support its funded debt

obligations going forward and generate the cash flow needed to be a going concern.

## III.

### Prepetition Restructuring Initiatives

37.    Pernix's management team has taken numerous actions in response to the challenges described above in order to enhance its operations, as well as to improve its liquidity profile. The Debtors have at the same time implemented aggressive cost-savings initiatives.

**A.    Operational Initiatives**

38.    Since mid-2016, the Debtors have consummated multiple operational initiatives in an attempt to develop a sustainable capital structure through a dual focus on reducing operating costs and expanding its product portfolio. On July 7, 2016, the Company announced a reduction of its full-time work force by approximately 23% in order to optimize resources and improve the effectiveness of its sales force by consolidating its neurology and pain sales forces under one management structure. Subsequently, on January 5, 2018, the Company announced a further reduction of its total full-time workforce by approximately 22% due to the impending loss of exclusivity of Treximet in February 2018.

39.    In mid-2018, before the extent of the Company's current financial difficulty was fully apparent and before the adverse Zohydro patent decision, Pernix consummated the Nalpropion transaction as part of the Company's effort to improve its cash flow and expand its scale. The transaction produced immediate economic benefits for the Company in the form of the management services fee and shared services reimbursement under the Services Agreement and provided an opportunity to meaningfully supplement the Company's cash flow and leverage its existing infrastructure on an ongoing basis. Additionally, the transaction offered Pernix the ability to increase its initial 10% equity ownership in the Nalpropion business to 49.9% and 100% through two purchase options at specified future times and purchase prices.

**B.    Deleveraging Initiatives**

40.    As discussed above, on July 20, 2017, Highbridge agreed to exchange $51.8 million of aggregate principal amount of Prepetition Convertible Notes for (i) $36.2 million aggregate principal amount of Prepetition Exchangeable Notes and (ii) 1,100,498 shares of common stock of Pernix.

41.    On August 1, 2018, the Company announced a series of transactions pursuant to which certain holders of the Prepetition Treximet Notes exchanged $12.2 million of Prepetition Treximet Notes for a combination of Pernix common and preferred equity. The Prepetition ABL Lenders also agreed to an amendment to the Prepetition ABL Facility that improved Pernix's borrowing capacity by permitting the Company to include Contrave inventory in the Prepetition ABL Facility borrowing base.

**C.    Restructuring Initiatives**

42.    As a result of the above-referenced negative events, in the fall of 2018, the Debtors engaged Guggenheim Securities, LLC ("Guggenheim Securities"), Davis Polk & Wardwell LLP ("Davis Polk") and Ernst & Young LLP ("E&Y") to assist management with its review of strategic alternatives. In November 2018, the Debtors, with the assistance of their retained professionals, reached out to the largest holders of the Debtors' funded debt, Highbridge and Deerfield Management Company, L.P. ("Deerfield"), to initiate discussions regarding potential restructuring transactions. Highbridge promptly agreed to engage, executed a non-disclosure agreement and, over the following weeks and months, dedicated significant time and resources to conducting due diligence and cooperatively developing a restructuring strategy with the Company.

43.    Following extensive, arm's-length negotiations, Highbridge agreed to offer the Debtors a package proposal under which, among other benefits, (1) Highbridge would provide

21

DIP financing to the Debtors on favorable below-market terms, (2) Highbridge would provide stalking horse asset bids for substantially all of the Debtors' assets structured to permit a fulsome and competitive auction process with minimal bid protections for Highbridge, and (3) Highbridge agreed to waive all interest payments due by the Debtors to Highbridge from the date of the proposal through February 1, 2019. Highbridge's initial proposal also required the Debtors to enter into an amendment to the Services Agreement and a TSA with Nalpropion, under which the Debtors and Nalpropion agreed to cooperate to transfer distribution services for Contrave to a third party distributor, while ensuring that the Debtors continue to receive distribution payments even following such transition. Under the TSA, the Debtors granted Nalpropion a second lien on the assets securing the Prepetition ABL Credit Agreement to secure the Company's obligations under the TSA. The high-level terms of this proposal were set forth in a term sheet (the "Highbridge Term Sheet"), which was delivered by Highbridge and Nalpropion to the Debtors on January 6, 2019. The Debtors had the option to accept or reject this proposal at any time after February 12, 2019 and prior to February 28, 2019.

44.     After the Debtors received the Highbridge Term Sheet, Deerfield executed a non-disclosure agreement on January 11, 2019. Shortly thereafter, other holders of the Prepetition Treximet Notes, also represented by Sullivan & Cromwell LLP ("S&C"), joined Deerfield under similar confidentiality agreements. This ad hoc group (the "Trex Group") purported to represent approximately 80% of the outstanding Prepetition Treximet Notes. On January 25, 2019, the Trex Group submitted an initial indicative financing term sheet.

45.     Over the following weeks, the Debtors' advisors provided diligence and guidance to the Trex Group and conducted a competitive process between Highbridge and the Trex Group, working with and guiding both to enhance their proposals for DIP financing and asset purchases

as much as possible, with respect to overall value and other business and legal terms. Ultimately, at the conclusion of this auction, while both the Trex Group and Highbridge had advanced and improved their proposals, the Debtors' Board concluded that the overall value offered by the substantially enhanced Highbridge proposal represented the best option available to the Debtors.

46.     The enhanced Highbridge proposal is reflected in an amended and restated version of the Highbridge Term Sheet (the "A&R Highbridge Term Sheet") delivered by Highbridge to the Company on February 6, 2019.  Among other enhancements, pursuant to the A&R Highbridge Term Sheet, Highbridge (i) increased the aggregate consideration that it committed to provide as a stalking horse bidder from approximately $44.5 million to up to approximately $75.6 million, (ii) decreased the interest rate under its proposed DIP facility from 7.5% to 6.0%, (iii) increased the maturity date of its proposed DIP facility from 120 days to 180 days, and (iv) pushed back the dates of certain key milestones.  The A&R Highbridge Term Sheet also required that the Company continue to perform its obligations under the Services Agreement and the TSA.  The Company factored this requirement into evaluating the relative merits of the Highbridge and Trex Group proposals, and Pernix's board determined that continued performance under the Services Agreement (including remittance of the February 2019 monthly payment to Nalpropion) was in the best interests of the Company and its stakeholders.

47.     In parallel, as described in greater detail in the *Declaration of Stuart Erickson in Support of Motion of Debtors for Entry of Orders (I)(A) Approving Sale Procedures for Sale of Debtors' Assets, (B) Approving Stalking Horse Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F)*

*Granting Related Relief and (II)(A) Approving Sale of Debtors' Assets Free and Clear of Liens,*
*Claims, Interests and Encumbrances, (B) Authorizing Assumption and Assignment of Executory*
*Contracts and Unexpired Leases and (C) Granting Related Relief* (the "Sale Declaration"), filed
contemporaneously herewith, the Debtors, with the assistance of Guggenheim Securities,
conducted a sales and marketing process to identify potential alternative stalking-horse options.
However, as described in the Sale Declaration, none of the third party bidders offered stalking
horse terms that were in the judgment of the Debtors' Board superior to Highbridge's Stalking
Horse Bid.  In addition, as described in the *Declaration of Stuart Erickson in Support of Motion*
*of Debtors for Interim and Final Orders (i) Authorizing Debtors (A) to Obtain Postpetition*
*Financing and (B) to Use Cash Collateral, (ii) Granting Adequate Protection to Certain*
*Prepetition Secured Parties, (iii) Scheduling a Final Hearing and (iv) Granting Related Relief*
(the "DIP Declaration"), filed contemporaneously herewith, the Debtors, with the assistance of
Guggenheim Securities, conducted a process to solicit financing offers from potential third-party
lenders.  The third-party proposal received by the Debtors contained economic terms that the
Debtors determined were materially less favorable than the DIP financing proposals offered by
both Highbridge and the Trex Group.

D.     **The Terms of the Section 363 Sale**

48.     The terms of the Section 363 Sale and the Sale Procedures are set forth in detail in
the Sale Procedures Motion.  The Stalking Horse APA represents a binding bid to purchase a
substantial portion of the Debtors' assets for total cash and credit bid consideration of
approximately $75.6 million plus the assumption of certain liabilities, subject to a limited and
standard set of closing conditions set forth in the Stalking Horse APA.  Notably, there is no
break-up fee under the Stalking Horse APA.  Under the Stalking Horse APA, if another bidder is

selected, the Stalking Horse Bidder is only entitled to reimbursement for reasonable and documented costs and expenses incurred by the Stalking Horse Bidder in connection with, among other things, the negotiation and execution of, and the carrying out of its obligations under, the Stalking Horse APA in an amount not to exceed 1.5% of the Purchase Price (as defined in the Stalking Horse APA). The Sale Procedures are designed to promote a competitive and expedient sale process.

49.     In support of the Section 363 Sale, certain funds managed by Highbridge have agreed to enter into a senior secured, multi-draw DIP financing facility with the Debtors providing up to $34.1 million in loans (the "DIP Financing") with the Debtors. The Debtors have an immediate need for DIP Financing. The proposed DIP Financing will provide critical liquidity necessary to, among other things, (a) operate the business in the ordinary course, (b) administer these Chapter 11 Cases, including to satisfy working capital and other operational needs, and (c) provide sufficient liquidity to operate until the consummation of the Section 363 Sale. The proposed DIP Financing is conditioned upon the Debtors' compliance with certain milestones with respect to progress in the Chapter 11 Cases.

## IV.

### First Day Motions

50.     To minimize the adverse effect of the commencement of these Chapter 11 Cases on the Debtors' ability to effectuate a timely and efficient restructuring process that will preserve and maximize the value of the Debtors' estates, the Debtors have filed the following First Day Motions:

- Motion of Debtors for Entry of an Order Directing Joint Administration of Chapter 11 Cases;

- Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent;

- Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) The Debtors to Continue to Maintain Existing Cash Management System, Bank Accounts and Business Forms, (II) Continued Engagement in Intercompany Transactions, (III) Financial Institutions to Honor and Process Related Checks and Transfers and (IV) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b) and the United States Trustee Operating Guidelines;

- Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) The Debtors to (A) Pay Prepetition Employee Obligations and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Current and Former Employees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers;

- Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance;

- Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors to Pay Certain Taxes, Governmental Assessments and Fees and (II) Financial Institutions to Honor and Process Related Checks and Transfers;

- Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) The Debtors to Continue and Renew Their Liability, Property, Casualty, and Other Insurance Policies and Honor All Obligations in Respect Thereof, (II) Financial Institutions to Honor and Process Related Checks and Transfers and (III) Debtors to Continue Insurance Premium Financing Obligations Arising in Connection Therewith and Renew or Enter into New Program Arrangements;

- Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Payment of Certain Prepetition Claims of Critical Vendors, (II) Payment of 503(b)(9) Claims to Certain Critical Vendors and (III) Financial Institutions to Honor and Process Related Checks and Transfers;

- Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) The Debtors to Honor Prepetition Obligations to Customers and Related Third Parties and to Otherwise Continue Customer and Sales Programs, (II) Grant Relief from Stay to Permit Setoff in Connection with the Customer and Sales Programs and (III) Financial Institutions to Honor and Process Related Checks and Transfers;

- Motion of Debtors for Entry of Interim and Final Orders Establishing Notice and Objection Procedures for Transfers of Equity Securities;

- Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Use Cash Collateral, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief;

- Motion of Debtors for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members;

- Application of Debtors for Authority to Employ and Retain Davis Polk & Wardwell LLP as Attorneys for the Debtors *Nunc Pro Tunc* to the Petition Date, supported by the Declaration of Eli J. Vonnegut in Support of the Application of Debtors for Entry of an Order Authorizing the Debtors to Employ and Retain Davis Polk & Wardwell LLP as Attorneys for the Debtors *Nunc Pro Tunc* to the Petition Date;

- Application of Debtors to Approve the Employment and Retention of Landis Rath & Cobb LLP as Their Delaware Counsel, Nunc Pro Tunc to the Petition Date, Pursuant to Bankruptcy Code Section 327(a), Bankruptcy Rules 2014 and 2016 and Local Rule 2014-1;

- Application of Debtors for Authority to Employ and Retain Ernst & Young LLP as Financial Advisors for the Debtors *Nunc Pro Tunc* to the Petition Date, supported by the Declaration of Ben Pickering in Support of the Application of Debtors for Entry of an Order Authorizing the Debtors to Employ and Retain Ernst & Young LLP as Financial Advisors for the Debtors *Nunc Pro Tunc* to the Petition Date;

- Application of the Debtors for Entry of an Order, Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, Authorizing the Retention and Employment of Guggenheim Securities, LLC as Investment Banker for the Debtors and Debtors

in Possession, *Nunc Pro Tunc* to the Petition Date, and Waiving Certain Time-Keeping Requirements of Local Rule 2016-2.

- Debtors' Application for an Order Authorizing the Employment and Retention of Prime Clerk LLC as Administrative Advisor Nunc Pro Tunc to the Petition Date;

- Motion of Debtors for Entry of an Order Authorizing Debtors to File Under Seal Portions of Their Creditor Matrix Containing Certain Individual Creditor Information;

- Motion of Debtors for Entry of an Order Authorizing the Debtors to (I) Reject Certain Unexpired Real Property Leases or Executory Contracts *Nunc Pro Tunc* to the Petition Date or Rejection Date and (II) Abandon Any Remaining Property at the Rejected Location;

- Motion of Debtors for Entry of an Order Authorizing the Employment and Retention of Professionals Utilized in the Ordinary Course of Business;

- Motion of Debtors for Entry of Orders (I)(a) Approving Sale Procedures for Sale of Debtors' Assets, (b) Approving Stalking Horse Protections, (c) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (d) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (e) Approving Assumption and Assignment Procedures and (f) Granting Related Relief and (II)(a) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (b) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases and (c) Granting Related Relief;

- Motion of Debtors for Entry of an Order (I) Extending the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases

and Statements of Financial Affairs, (II) Extending the Time to Schedule the Meeting of Creditors, (III) Waiving the Requirements to File Equity Lists and Provide Notice to Equity Security Holders and (IV) Authorizing the Debtors to File a Consolidated List of the Debtors' Thirty (30) Largest Unsecured Creditors;

51.    I have reviewed each of the First Day Motions, including any exhibits thereto, and incorporate by reference each of the factual statements set forth in the First Day Motions. I believe that the relief requested by the First Day Motions is necessary to enable the Debtors to preserve and maximize value and efficiently implement their restructuring efforts without disruption or delay.


[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]

## DECLARATION

48.    Pursuant to section 1746 of title 28 of the United States Code, I declare

under penalty of perjury that the foregoing is true and correct.

## RELIEF REQUESTED

49.    I respectfully request that the Court grant all relief requested in the First

Day Motions and such other and further relief as may be just and proper.


Dated: February 18, 2019                    Pernix Therapeutics Holdings, Inc.
                                            Pernix Therapeutics, LLC
                                            Pernix Manufacturing, LLC
                                            Pernix Sleep, Inc.
                                            Cypress Pharmaceuticals, Inc.
                                            Hawthorn Pharmaceuticals, Inc.
                                            Macoven Pharmaceuticals, L.L.C.
                                            Gaine, Inc.
                                            Respicopea Inc.
                                            Pernix Ireland Limited
                                            Pernix Ireland Pain Designated
                                            Activity Company
                                            Pernix Holdco 1, LLC
                                            Pernix Holdco 2, LLC
                                            Pernix Holdco 3, LLC

                                            John A. Sedor
                                            Chairman of the Board and Chief
                                            Executive Officer