IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PERNIX SLEEP, INC., *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-10323 (CSS)<br><br>Jointly Administered<br><br>**Proposed Hearing Date: April 8, 2019 @ 3:30 p.m. (E.T.)**<br>**Proposed Obj. Deadline: April 1, 2019 @ 4:00 p.m. (E.T.)** |

**JOINT MOTION OF THE DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER APPROVING THE SETTLEMENT BETWEEN THE DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

The above-captioned debtors and debtors in possession (the "Debtors") and the Official Committee of Unsecured Creditors (the "Committee" and, together with the Debtors, the "Movants") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), by and through their undersigned counsels, hereby submit this *Joint Motion of the Debtors and Official Committee of Unsecured Creditors for an Order Approving the Settlement Between the Debtors and Official Committee of Unsecured Creditors* (the "Motion"), pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order (the "Settlement Order"), substantially in the form attached hereto as Exhibit A, approving the settlement (the "Settlement") memorialized in the binding Settlement Term Sheet (the "Settlement Term

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, are: Pernix Therapeutics Holdings, Inc. (4736), Pernix Therapeutics, LLC (1128), Pernix Manufacturing, LLC (1236), Pernix Sleep, Inc. (1599), Cypress Pharmaceuticals, Inc. (1860), Hawthorn Pharmaceuticals, Inc. (2769), Macoven Pharmaceuticals, L.L.C. (4549), Gaine, Inc. (3864), Respicopea, Inc. (1303), Pernix Ireland Limited (3106PH), Pernix Ireland Pain Designated Activity Company (0190LH), Pernix Holdco 1, LLC (N/A), Pernix Holdco 2, LLC (N/A), Pernix Holdco 3, LLC (N/A). The Debtors' corporate headquarters and mailing address is 10 North Park Place, Suite 201, Morristown, NJ 07960.

{1228.002-W0055000.}

Sheet"), attached hereto as Exhibit B. In support of this Motion, the Movants respectfully state as follows:

## PRELIMINARY STATEMENT

1. The Debtors filed these cases intending to complete an expedited sale process, based on their firm belief that a rapid process would be critical to preserving the value of the estate's assets, and to minimizing the cost of this proceeding in order to ensure that as much of the estate's value as possible is available for distribution to creditors. The Debtors also recognized from the outset, however, that in order to achieve their targeted timetable, they would have to persuade their stakeholders, most importantly including the Committee, that speed benefits all stakeholders, and that an equitable plan to distribute the available value would have to be agreed upon.

2. Many chapter 11 cases present this difficult task for the debtor, their secured creditors, and the unsecured creditor body: specifically, how to maximize dwindling value of a debtor's assets, distribute value according to a priority waterfall, and give adequate value to unsecured creditors who may or may not be "out of the money" and whose right to value may hinge on litigation against the debtor and other stakeholders.

3. The Debtors are pleased to report that the Committee, the Debtors, and the Debtors' largest secured creditor, who is also acting as the Debtors' stalking horse bidder and DIP Lender (as defined in the Settlement Term Sheet, "Highbridge") (collectively, the "Parties") have worked expeditiously since the Committee's formation to solve this conundrum in a way that the Parties believe maximizes value for all stakeholders. With the assistance and cooperation of the Debtors and Highbridge, the Committee has looked at and analyzed, among other things, (a) the Company's July 2017 financing transactions, (b) the transactions related to the 2018 acquisition of Contrave by Nalproprion Pharmaceuticals, Inc. ("Nalpropion"); (c) the

Company's prepetition sale process, (d) the Company's payment of bonuses to management during the pre-petition period; (e) the DIP Loan Agreement; (f) Stalking Horse Bid, (g) the KEIP Motion, and (h) the Debtors' motion to retain Guggenheim. Rather than expend the estates' dwindling resources engaging in litigation over these various issues that may or may not yield value for unsecured creditors, the Parties engaged in good faith negotiations in order to settle their differences early in the case, thereby preserving as much value as possible for stakeholders, while still delivering adequate value for potential unsecured creditor claims and causes of action. These efforts were successful and the Parties have agreed, after giving the Committee time to conduct its analysis, on a quicker-than-usual settlement where all stakeholders receive something, all stakeholders give up something, and all stakeholders agree to take calculated risks. Specifically:

a. Unsecured creditors (excluding unsecured claims held by Highbridge) will receive a $3.6 million cash pot[2] funded by Highbridge, regardless of what may otherwise happen in the Chapter 11 Cases;

b. Unsecured creditors (excluding unsecured claims held by Highbridge) will receive, subject to terms set forth in the Settlement Term Sheet, the right to pursue claims against current and former directors and officers (to the extent of available D&O insurance coverage) and certain avoidance claims, on a post-effective date basis (the "Preserved Claims");

c. Unsecured creditors will forego the possibility of "upside" value from (1) the auction of the Debtors' assets and (2) the potential victory in intellectual property litigation;

---

[2] According to the Debtors' books and records, and their current forecasts, the total general unsecured claims pool (not including Highbridge's unsecured claims) will be approximately $88 million. In addition, the Debtors are aware that certain WARN Act plaintiffs believe that they are entitled to a substantial unsecured priority claim. The Debtors vehemently disagree with the WARN Act plaintiff's assertion as to such unsecured priority claim and reserve all rights.

    d. The Debtors will be able to complete an expedited marketing and sales process which they believe is necessary to maximize value (which will also benefit unsecured creditors who continue to do business with the Debtors); and

    e. All parties will work together to minimize the fee burn in the case, including certain hard and soft caps on the Committee's professionals which, if not exhausted, may provide incremental recovery to unsecured creditors.

4.     From the Debtors' perspective, the Settlement gives greater certainty – certainty on timing, certainty on process, and certainty of the absence of litigation (and the concomitant draining of estate resources). Specifically, the Debtors have gained the Committee's support of the DIP financing. The Debtors have also gained the Committee's support of the KEIP Motion and the motion to approve the retention of Guggenheim, which will ensure parties critical to a value-maximizing restructuring are properly incentivized and rewarded. With the Settlement in place, the Debtors will now be able to focus on running the auction (in hopes of obtaining more value) and minimizing costs until emergence.

5.     From the Committee's perspective, the Settlement provides certainty with regard to a significant pot of cash for unsecured creditors, plus any amounts that can be recovered from the Preserved Claims. The Committee believes that the Preserved Claims are a potential additional source of recovery for unsecured creditors.

6.     Viewed in totality, this settlement is a substantial achievement for the Debtors, the Committee, and stakeholders at large and should be approved as far above the lowest rung in the range of reasonableness.

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.[3]

8.      The legal predicates for the relief sought herein are section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(a).

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## GENERAL BACKGROUND

10.     On February 18, 2019 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by each filing with the Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

11.     The Debtors continue to operate their business and manage their properties as debtors-in-possession, pursuant to Bankruptcy Code sections 1107(a) and 1108.  As of the date of this Motion, no trustee or examiner has been appointed in these Chapter 11 Cases.

12.     On March 1, 2019, the Office of the United States Trustee (the "U.S. Trustee") appointed the Committee [D.I. 96].  The members of the Committee are Telemetry Securities LLC; 683 Capital Partners, LP; Medicine to Go Pharmacies, Inc. and certified class; Chad Myers

---

[3] Pursuant to Local Rule of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") 9013-1(f), the Debtors and the Committee hereby confirm their consent to entry of a final order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

and Jeffrey Hartzler, on behalf of themselves and others similarly situated in Adv. No. 19-50107; and Walgreen Co.

13. A detailed description of the Debtors and their business, and the facts and circumstances surrounding the Chapter 11 Cases, are set forth in greater detail in the *Declaration of John A. Sedor in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") [D.I. 3].[4]

14. Highbridge asserts, and the Debtors have acknowledged, that as of the Petition Date, the Debtors are indebted to Highbridge for substantially all of its secured debt outstanding as of the Petition Date. As set forth in the First Day Declaration, the Debtors' prepetition secured debt includes approximately $14.1 million in aggregate principal amount outstanding under the Prepetition ABL Credit Agreement, $39.2 million in aggregate principal amount plus an additional $1.1 million of accrued pay-in-kind interest outstanding under the Prepetition DDTL Credit Agreement, and approximately $154 million in aggregate principal amount of the Prepetition Treximet Notes. The Debtors also had funded unsecured debt outstanding as of the Petition Date that included $78 million in aggregate principal amount of the Prepetition Convertible Notes and $35 million of aggregate principal amount of the Prepetition Exchangeable Notes.

15. As previewed with the Court at the first-day hearing, time is not a friend to these chapter 11 cases. To that end, immediately upon the formation of the Committee, the Debtors and their advisors engaged extensively and constructively with the Committee's advisors, assisting them in their diligence and analysis of the Debtors' history and their proposed restructuring, including their DIP Financing Facility and sale process. The Committee conducted

---

[4] Except as otherwise indicated, capitalized terms used but not defined in this Motion have the meanings ascribed to them in the First Day Declaration or if not defined therein, as such terms are defined in the Bankruptcy Code.

{1228.002-W0055000.}                                      6

a preliminary analysis into the nature, validity, extent, and priority of the liens and claims asserted by Highbridge, potential alternatives to the sale process proposed by the Debtors, and potential litigation or other avenues to enhance recoveries for unsecured creditors in these Chapter 11 Cases. As a result of this preliminary analysis, and as noted above, the Committee raised a variety of potential objections and arguments it might assert absent an agreement to consensually address its concerns.

16. In addition, the Committee, the Debtors, and Highbridge engaged in extensive, arm's-length and good faith negotiations towards an efficient and value-maximizing consensual settlement of the Committee's concerns. The Debtors and the Committee believe that the Settlement provides clear and substantial value for the Debtors' estates and to unsecured creditors, and should be approved. The Settlement additionally lays the groundwork for a successful plan process, and will allow all parties in interest to focus their full energies on a successful sale process, rather than value-destructive litigation.

## **NATURE OF THE CLAIMS BEING SETTLED**

17. In the course of its diligence, the Committee evaluated potential avoidance claims based on fraudulent conveyance and preference in connection with certain transactions entered into pre-Petition by the Debtors involving Highbridge (the "Claims"). These transactions included (i) a 2017 refinancing by which Highbridge converted unsecured Convertible Notes to structurally senior Exchangeable Notes and lent new money secured by liens on valuable assets that had previously been unencumbered and available to satisfy claims of unsecured creditors (the "2017 Refinancing"), (ii) the Nalpropion 2018 joint venture between Highbridge and the Debtors, and (iii) the acquisition by Highbridge of approximately $125 million in Treximet Notes in the lead-up to this restructuring. The Committee specifically considered how these

transactions might give rise to claims for, among other things, constructive fraudulent transfer, preference, and recharacterization.

18.     The Committee has also evaluated potential director and officer liability claims related to these same transactions; those claims are not being settled but instead being placed into a litigation trust as set forth in the Settlement Term Sheet.

19.     Finally, the Committee evaluated potential objections related to the Debtors' (a) KEIP Motion, (b) motion to retain Guggenheim as their investment banker, (c) DIP Financing motion, and (d) motion to approve bid procedures and stalking horse sale agreement. The Committee also evaluated potential claims and causes of action related to the Debtors prepetition bonus payments to their management team.

## DESCRIPTION OF SETTLEMENT

20.     In an effort to avoid the costs and time associated with protracted further investigation and litigation relating to the Claims, and to preserve value that might otherwise be consumed by such a process for creditors, the Parties have agreed, subject to the Court's approval, to implement the Settlement, which is memorialized in the binding Settlement Term Sheet.

21.     The material economic terms of the Settlement Term Sheet are as follows:[5]

(a)     The NH Unsecureds[6] will receive (i) $3.6 million in cash, (ii) avoidance actions and proceeds and (iii) any estate causes of action (the "D&O Claims") against the current or former directors and officers of the Debtors (each a "D&O Party") other than Avoidance

---

[5] This overview is qualified in its entirety by reference to the provisions of the Settlement Term Sheet. In the event of any inconsistency between the terms of this overview and the terms of the Settlement Term Sheet, the Settlement Term Sheet shall govern in all respects. Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to them in the Settlement Term Sheet.

[6] As define in the Settlement Term Sheet, "**NH Unsecureds**" means only the following holders of unsecured claims: (a) holders of the Convertible Notes, and (b) holders of general unsecured claims at any of the Debtors, including any Contingent Employee Litigation Claims. For the avoidance of doubt, "NH Unsecureds" does not include any holders of funded debt claims other than holders of the Convertible Notes claims.

Claims that (x) are subject to the Plan's release and exculpation provisions, (y) relate in any way to the assets or businesses acquired under the Asset Purchase Agreement, or (z) are against Highbridge, its management company, or any of their respective officers, directors, advisors, representatives, subsidiaries, managed funds, affiliates, shareholders, partners, etc. (such causes of action, but for the avoidance of doubt not including those carved out in preceding clauses (x), (y) and (z), the "Preserved Actions"); provided that (i) any recovery by or on behalf of the NH Unsecureds (and the beneficiaries thereof) on account of any D&O Claim, including in each case by way of settlement or judgment, shall be limited to the Debtors' available D&O liability insurance policies' combined limits, after payment from such D&O liability insurance policies of any and all covered costs and expenses incurred by all of the D&O Parties in connection with the defense of the D&O Claims (the "Insurance Coverage"); (ii) no party, including any trustee or any beneficiary of the NH Unsecureds, shall execute, garnish or otherwise attempt to collect on any settlement of or judgment in the D&O Claims upon any assets of any D&O Party except to the extent necessary to trigger the Insurance Coverage; (iii) in the event coverage is denied under the D&O liability insurance policies for any settlement or judgment in the NH Unsecureds' favor, the D&O Parties shall assign any claims for coverage or other rights of recovery they may have against the D&O liability insurers to the NH Unsecureds; and (iv) all of the D&O Claims shall be released automatically and fully discharged only upon the earlier of (x) the abandonment of such causes of action to the estate on the Effective Date, (y) such a release being given as part of any later settlement of the D&O Claims; or (z) exhaustion of the available insurance coverage.

(b)    Proceeds of estate causes of action described in (a) above will be excluded from the collateral securing the DIP Facility.

(c)    Highbridge will waive any right to participate on account of the Exchange Notes or Trex Notes held by Highbridge in the NH Unsecured Cash Recovery. Highbridge will waive any right to participate on account of Exchange Notes or Trex Notes held by Highbridge in any proceeds recovered by the NH Unsecureds unless and only to the extent that Highbridge hereafter becomes obligated to pay any amounts under the Note Purchase Agreement ("HB's Participation Right"); provided that Highbridge shall not be entitled to HB's Participation Right unless and until the aggregate recoveries, from any source, paid to holders of the Convertible Notes exceed $4.0 million (including, without limitation, any portion of the NH Unsecured Cash Recovery paid to holders of the Convertible Notes).

(d)    The Debtors, the Committee and Highbridge all agree to support and pursue confirmation of a Plan that provides that to the extent that the Committee or a to-be-formed litigation trust is unable, prior to the Effective Date, to either (a) retain a law firm to bring Preserved Actions on a contingency fee basis, (b) obtain litigation financing to pursue the Preserved Actions, or (c) otherwise arrange to finance the Preserved Actions other than from the NH Unsecured Cash Recovery, then the NH Unsecureds will be deemed to have abandoned such claims and causes of action back to the estate on the Effective Date.

(e)    The Committee agrees that this settlement is not subject to the exercise of the Committee's fiduciary duties. Therefore, so long as the NH Unsecureds receive the recoveries set forth in the Settlement Term Sheet, the Committee will not exercise any "fiduciary duty" out.

(f) The Debtors, the Committee, and Highbridge all agree to support and pursue confirmation of a Plan that shall provide for a trust (the "NH Unsecureds Trust") to be established for the sole purpose of reconciling NH Unsecured Claims (to the extent not reconciled by the Debtors prior to the Effective Date) against the Debtors and making distributions on account of such claims following the reconciliation of all NH Unsecured Claims against the Debtors. The Debtors shall fund the NH Unsecureds Trust with the amount of the NH Unsecured Cash Recovery on the Effective Date and the Debtors, Highbridge and their respective affiliates shall not have any further liability with respect to NH Unsecured Claims against the Debtors regardless of the amount of NH Unsecured Claims asserted or allowed against the Debtors. The trustee of the NH Unsecureds Trust shall be appointed by the Committee in consultation with the Debtors and Highbridge.

(g) If the Committee seeks to convert or dismiss the Chapter 11 Cases or appoint a trustee or examiner or objects to any aspect of the Plan, the DIP Motion, the Sale or the Sale Procedures (other than any objection that is based upon enforcing the terms of the Settlement), or otherwise violates the terms of the Settlement, then (a) Highbridge's agreements set forth in the Settlement Term Sheet shall be null and void and (b) all of the proposed distributions to NH Unsecureds hereunder may, in the Debtors' sole discretion, be eliminated and any distributions to NH Unsecureds under the Plan allocated on an absolute priority basis. The Committee will affirmatively support a Plan that is consistent with the terms set forth the Settlement Term Sheet.

22. The Parties have also agreed to support the following proposed timeline in connection with a chapter 11 plan of liquidation implementing the terms of the Settlement, subject to the Court's availability:

(a) No later than April 18: Debtors will file a chapter 11 plan of liquidation and corresponding Disclosure Statement.

(b) No later than May 20: The hearing for interim approval of the Disclosure Statement and solicitation procedures shall have occurred.

(c) No later than June 30: The hearing for final approval of the disclosure statement, confirmation the plan of liquidation, and the effective date of the plan, shall each have occurred.

## RELIEF REQUESTED

23. By this Motion, and pursuant to Bankruptcy Code section 105(a) and Bankruptcy Rule 9019(a), the Movants seek entry of the Settlement Order, substantially in the form attached hereto, (i) approving the Settlement memorialized in the Settlement Term Sheet and (ii)

authorizing the Parties to enter into and implement the Settlement Term Sheet, in accordance with the terms thereof.

## BASIS FOR RELIEF

### A. Standard for Approving Settlement

24. Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Fed. Bankr. R. 9019(a). "In exercising this discretion, the bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interests of the estate." *In re Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005). Bankruptcy courts in the Third Circuit, like the United States Supreme Court, have emphasized that "compromises are favored in bankruptcy" in order "to minimize litigation and expedite the administration of a bankruptcy estate." *Id.* (internal quotations omitted); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (noting settlement and compromise are "a normal part of the process of reorganization") (internal quotations omitted); *In re Culmtech, Ltd.*, 118 B.R. 237, 238 (Bankr. M.D. Pa. 1990) (observing that "compromises are favored in bankruptcy and . . . much of litigation in bankruptcy estates results in settlements").

25. In determining whether to approve a proposed settlement pursuant to Bankruptcy Rule 9019(a), a court must find that the proposed settlement is fair and equitable. *TMT Trailer*, 390 U.S. at 424. The settlement need not be the best that the debtor could have obtained. *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979). Rather, the settlement must fall "within the reasonable range of litigation possibilities." *Id.* The decision to accept or reject a compromise is within the sound discretion of the bankruptcy court. *See, e.g., In re Coram Healthcare Corp.*, 315 B.R. 321, 329 (Bankr. D. Del. 2004). The bankruptcy court, however,

may "give[] deference to a Debtors' business judgment in deciding whether to settle a matter." *See In re Key3Media Grp., Inc.*, 336 B.R. at 93. A bankruptcy court "need not decide the numerous questions of law or fact raised by litigation, but rather should canvass the issues to determine whether the settlement falls above the lowest point in the range of reasonableness." *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 514 (Bankr. D. Del. 2010) (Sontchi, J.); *In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986).

26. Bankruptcy courts in the Third Circuit have applied the following factors in determining whether a proposed settlement is fair, reasonable and in the best interest of the estate: (a) the probability of success in litigation; (b) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (c) the likely difficulties in collection; and (d) all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. *See In re TSIC, Inc.*, 393 B.R. 71, 78-79 (Bankr. D. Del. 2008) (citing *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006)). Consideration of these factors requires the Court to make an objective, informed comparison of the results of litigation versus the benefits of compromise. *See TMT Trailer*, 390 U.S. at 424.

27. As discussed elsewhere, the Settlement embodied in the Settlement Term Sheet has broad support from the Debtors, the Committee, and Highbridge, and the Movants respectfully submit that the Settlement is more than fair and equitable, falls within the range of reasonableness, is in the best interests of the Debtors' estates and creditors and should be approved.

**B.      The Settlement Satisfies the Standards for Approval Under Section 9019**

(1)     The Probability of Success of the Claims

28.     The Movants weighted the probability of success of the Claims, and on balance concluded that the proceeding with the Settlement is a superior option for the Parties than pursuing the claims. By their nature, the Claims are complex and challenging to prove. For example, to prevail on a constructive fraudulent transfer claim in connection with the 2017 Refinancing, the Movants would have to show that Pernix Therapeutics Holdings incurred liens and obligations for less than reasonably equivalent value and at a time it was insolvent or was rendered insolvent thereby, a very fact-intensive and expensive inquiry[7]. Similarly, objections to the KEIP, the DIP Motion, the Sale Motion, and the Guggenheim success fees may would each, individually, have their own strengths and weaknesses, which may or may not result in recoveries for unsecured creditors. After reasonable diligence and investigation, the Movants concluded that prevailing on such claims would be time consuming and costly, and that likelihood of succeeding on the Claims would not justify the associated cost and delay (discussed briefly below).

(2)     Complexity, Expense and Inconvenience of Litigation

29.     Developing and prosecuting the Claims would likely have been very expensive for the estate, delaying the sale process and emergence, and placing substantial additional burdens on the Debtors' executives and professionals, who are focused on the Debtors' reorganization and operations. Even at this preliminary stage, the Committee has already identified three separate, complex transactions spanning nearly two years in time that it believes

---

[7]     To be clear, the Committee believes that the Preserved Actions may potentially have value, and nothing in this Motion should be construed as an admission or concession by the Committee with regard to the facts thereto.

could warrant further analysis pursuant to Fed. R. Bankr. P. 2004 ("Rule 2004"). Such diligence would require extensive fact discovery, including document production and depositions of key witnesses. The retention of experts would be required as well, particularly as to complex issues of valuation and solvency. Discovery would be targeted not only at the Debtors (including their senior executives and directors) but Highbridge, Nalpropion, and the Treximet Noteholders from whom Highbridge purchased notes on the eve of the filing of these cases. Following Rule 2004 discovery, the Movants would draft a lengthy complaint and, if necessary, the Committee might conceivably need to seek standing to bring an action (which could itself result in additional discovery and a hearing). Following commencement of litigation, lengthy and complex motion practice would invariably ensue as to the particular claims asserted, and following that, additional fact and expert discovery in advance of summary judgment and trial. There is no doubt that Movants' combined legal spend during this protracted litigation process would be millions of dollars and would be highly disruptive to the Debtors' efforts to quickly emerge from bankruptcy and reorganize and rebuild their business. Further, and after weighing all options, the Committee believed that rather than spend resources on such litigation, unsecured creditors may benefit from direct receipt of such funds.

        (3)    <u>Other Factors Relevant to Wisdom of the Settlement</u>

30.    Whether a settlement was the result of arm's-length bargaining and not the result of fraud or collusion may be a factor weighed by a court in determining whether to approve a proposed settlement. *See In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994). Here, the Settlement was proposed, negotiated and entered into by the Debtors, the Committee and Highbridge with the assistance of competent counsel, without collusion, in good faith and after extensive arm's-length bargaining. After a thorough analysis of the legal and factual issues that

would be involved in resolving their disputes, and the different pathways to attempt to maximize available value, the Debtors and the Committee concluded that it would be beneficial to explore a settlement and ultimately in the best interests of the Debtors' estates to enter into the Settlement.

31. In short, the decision by the Debtors, the Committee and Highbridge to agree to the proposed Settlement was made after full and complete assessment of the factual record and the applicable law. Moreover, the Debtors, the Committee and Highbridge through their respective counsel, engaged in extensive negotiations regarding the terms and conditions of the Settlement. In light of these facts, it is clear that the Settlement was the result of arm's-length negotiations.

### C. The Settlement Should Be Approved as Fair and Reasonable

32. The Settlement represents a major milestone in these Chapter 11 Cases. It was achieved expeditiously and collaboratively. Indeed, the Debtors and Highbridge engaged with the Committee immediately following its appointment with the goal of assisting the Committee in performing its evaluation of the Debtors, potential estate claims, and other matters germane to potential creditor recoveries. In furtherance of the foregoing, counsel to both the Debtors and Highbridge hosted Committee representatives for multiple in-person due diligence sessions. This process produced the Settlement, which ensures recoveries for unsecured creditors while saving the estate significant resources by avoiding prolonged and contentious discovery, motion practice and litigation. In short, the Settlement represents a model outcome for a chapter 11 case such as this, where resources are limited and time is of the essence.

33. The Settlement is fair and reasonable and will help pave the way for recoveries for unsecured creditors that may not be available on an absolute priority basis absent the

Settlement. Under the Settlement, the Committee has agreed to affirmatively support confirmation of a Plan that is consistent with the provisions set forth in the Settlement Term Sheet. The Parties have also agreed to set aside sufficient funds to provide a distribution to the Debtors' general unsecured creditors. Absent such agreement, extensive investigation and litigation by the Committee may have delayed the sale process, consumed available value in professional fees, and left unsecured creditors with no hope of ever receiving a recovery on account of their claims. The Settlement also constitutes an important step toward the consummation of a sale of the Debtors' assets, a crucial milestone in bringing these Chapter 11 Cases to their conclusion.

### D.    The Settlement is not a *Sub Rosa* Plan

34.    Finally, the Movants are not seeking to use the Settlement to circumvent the plan confirmation process or the creditor protections of chapter 11. Courts reject settlements or sales as impermissible *sub rosa* plans when creditors are "denied certain protection because approval is sought pursuant to § 363(b) instead of as part of a reorganization plan." *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1228 (5th Cir. 1986). However, as noted above, the Settlement expressly contemplates confirmation of a Plan by a date certain. Thus, the Debtors have agreed, pursuant to the Settlement, to expeditiously work to "scale the hurdles erected in Chapter 11." *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways)*, 700 F.2d 935, 940 (5th Cir. 1983).

35.    The Settlement does not "'dictate,' or 'arrange' ex ante . . . the terms of" the Debtors' plan, as would be true in the case of a *sub rosa* plan. *See In re Chrysler LLC*, 576 F.3d 108, 117 n.9 (2d Cir. 2009), *vacated as moot sub nom. Indiana State Police Pension Trust v. Chrysler LLC*, 558 U.S. 1087 (2009) (mem.). The terms of the relative recoveries by other

stakeholders will be set forth in the Debtors' proposed plan of liquidation, which will have to be approved (or not) by those stakeholders, and the Settlement does not dictate these recoveries. Thus, the Settlement in no way "short circuit[s] the requirements of Chapter 11 for confirmation of a reorganization plan." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (citation and alteration omitted).

36. For all of the foregoing reasons, the Movants respectfully submit that the Settlement is fair and reasonable and in the best interests of the Debtors, their creditors and estates, and should be approved in its entirety.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

WHEREFORE, the Movants respectfully request that the Court enter the Settlement Order, substantially in the form attached hereto as Exhibit A, and grant such other and further relief as is just and proper.

Dated: March 21, 2019
Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

/s/ R. Stephen McNeill
Jeremy W. Ryan (No. 4057)
R. Stephen McNeill (No. 5210)
1313 N. Market St., Sixth Floor
P.O. Box 951
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: jryan@potteranderson.com
rmcneill@potteranderson.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Arik Preis (admitted *pro hac vice*)
Gary A. Ritacco (admitted *pro hac vice*)
Rachelle L.T. Rubin (admitted *pro hac vice*)
One Bryant Park
Bank of America Tower
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: apreis@akingump.com
gritacco@akingump.com
rlrubin@akingump.com

*Proposed Counsel to the Committee*

**LANDIS RATH & COBB LLP**

/s/ Kerri K. Mumford
Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
Jennifer L. Cree (No. 5919)
Nicolas E. Jenner (No. 6554 )
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
mumford@lrclaw.com
cree@lrclaw.com
jenner@lrclaw.com

-and-

**DAVIS POLK & WARDWELL LLP**
Elliot Moskowitz (admitted *pro hac vice*)
Eli J. Vonnegut (admitted *pro hac vice*)
Christopher S. Robertson (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email: elliot.moskowitz@davispolk.com
eli.vonnegut@davispolk.com
christopher.robertson@davispolk.com

*Proposed Counsel to the Debtors and Debtors-In-Possession*