## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PERNIX SLEEP, INC., *et al.*[1] | Case No. 19-10323 (CSS) |
| Debtors. | Jointly Administered |

**FIRST AMENDED DISCLOSURE STATEMENT FOR THE JOINT PLAN OF PERNIX SLEEP, INC. AND ITS AFFILIATED DEBTORS-IN-POSSESSION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED ON AN INTERIM BASIS BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR INTERIM APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT ON AN INTERIM BASIS OR OTHERWISE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES NOR IS IT SOLICITING AN OFFER TO BUY ANY SECURITIES. INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AN AUDIT.

**DAVIS POLK & WARDWELL LLP**
Eli J. Vonnegut *(Admitted pro hac vice)*
Christopher S. Robertson *(Admitted pro hac vice)*
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

*Counsel to Debtors and Debtors-In-Possession*

**LANDIS RATH & COBB LLP**
Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
Jennifer L. Cree (No. 5919)
Nicolas E. Jenner (No. 6554)
919 Market Street, Suite 1800
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

*Counsel to the Debtors and Debtors-In-Possession*

Dated: May 6, 2019

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, are: Pernix Therapeutics Holdings, Inc. (4736), Pernix Therapeutics, LLC (1128), Pernix Manufacturing, LLC (1236), Pernix Sleep, Inc. (1599), Cypress Pharmaceuticals, Inc. (1860), Hawthorn Pharmaceuticals, Inc. (2769), Macoven Pharmaceuticals, L.L.C. (4549), Gaine, Inc. (3864), Respicopea, Inc. (1303), Pernix Ireland Limited (3106PH), Pernix Ireland Pain Designated Activity Company (0190LH), Pernix Holdco 1, LLC (N/A), Pernix Holdco 2, LLC (N/A), Pernix Holdco 3, LLC (N/A). The Debtors' corporate headquarters and the mailing address is 10 North Park Place, Suite 201, Morristown, NJ 07960.

## DISCLAIMER

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT[2] IN CONNECTION WITH THE FIRST AMENDED JOINT PLAN OF PERNIX SLEEP, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. THE DEBTORS ARE REQUESTING THAT THE BANKRUPTCY COURT CONFIRM THE PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. YOU SHOULD NOT RELY ON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN MAKING AN INFORMED JUDGMENT ABOUT VOTING TO EITHER ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS DETERMINED THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH THEIR OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE DISCLOSURES CONTAINED IN

---

[2] Unless otherwise defined herein, capitalized terms contained in this Disclosure Statement shall have the same meanings ascribed to them in either the Plan, the Bankruptcy Code or the Bankruptcy Rules, as applicable.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS OR INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND/OR OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR POTENTIAL OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS BEFORE AND AFTER THE CONFIRMATION OF THE PLAN OR EFFECTIVE DATE THEREOF IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL OR NON-MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT AND ITS ADVISORS HAVE REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE FILING OF THIS

DISCLOSURE STATEMENT.  EACH HOLDER OF A CLAIM OR INTEREST MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN ORDER TO MAKE AN INFORMED JUDGEMENT ABOUT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

EACH HOLDER OF A CLAIM OR INTEREST SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN, IN ORDER TO MAKE AN INFORMED JUDGMENT ABOUT VOTING TO EITHER ACCEPT OR REJECT THE PLAN.

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| **I.** | **INTRODUCTION** | 5 |
| | **1.1** PURPOSE OF THE DISCLOSURE STATEMENT | 5 |
| | **1.2** CONFIRMATION OF THE PLAN | 5 |
| | **1.3** VOTING ON THE PLAN. | 8 |
| | **1.4** ACCEPTANCE OF THE PLAN | 9 |
| | **1.5** SOURCES OF INFORMATION | 10 |
| | **1.6** ADDITIONAL INFORMATION | 10 |
| **II.** | **THE DEBTORS** | 11 |
| | **2.1** DESCRIPTION OF THE DEBTORS AND THE DEBTORS' BUSINESSES | 11 |
| | **2.2** THE DEBTORS' PREPETITION CAPITAL STRUCTURE | 12 |
| | **2.3** EVENTS LEADING TO THE BANKRUPTCY FILING | 15 |
| | **2.4** THE DEBTORS' BANKRUPTCY PROCEEDINGS | 18 |
| | **2.5** SECURED CLAIMS ENCUMBERING THE DEBTORS' PROPERTY | 20 |
| | **2.6** ADMINISTRATIVE CLAIMS. | 21 |
| | **2.7** UNSECURED CLAIMS AGAINST THE DEBTORS | 21 |
| **III.** | **SUMMARY OF THE CHAPTER 11 PLAN** | 21 |
| | **3.1** IN GENERAL | 21 |
| | **3.2** CLASSIFICATION OF CLAIMS AND INTERESTS | 22 |
| | **3.3** TREATMENT OF UNIMPAIRED CLAIMS AND CLASSES | 23 |
| | **3.4** TREATMENT OF IMPAIRED CLASSES | 25 |
| | **3.5** IMPLEMENTATION OF THE PLAN | 26 |
| | **3.6** FUNDING AND DISBURSEMENTS | 34 |
| | **3.7** GLOBAL SETTLEMENT | 38 |
| | **3.8** TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 39 |
| | **3.9** RELEASE, INJUNCTION AND RELATED PROVISIONS | 40 |
| | **3.10** CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 43 |
| | **3.11** MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN | 44 |
| | **3.12** RETENTION OF JURISDICTION | 44 |
| | **3.13** MISCELLANEOUS PROVISIONS | 45 |

i

**IV.   FEASIBILITY** ..................................................................................................... 48

    **4.1   FINANCIAL FEASIBILITY ANALYSIS.** ...................................................... 48

**V.   ALTERNATIVES TO THE PLAN** ............................................................... 48

    **5.1   CHAPTER 7 LIQUIDATION** ...................................................................... 48

    **5.2   ALTERNATIVE PLAN(S)** .......................................................................... 49

**VI.   RISK FACTORS** ........................................................................................... 49

    **6.1   CERTAIN BANKRUPTCY CONSIDERATIONS** ........................................ 49

    **6.2   CLAIMS ESTIMATION & CASH AVAILABLE AFTER DISTRIBUTION** ... 49

**VII.   CONCLUSION** ............................................................................................. 50

**<u>EXHIBITS</u>**

EXHIBIT A            First Amended Chapter 11 Plan

# EXECUTIVE SUMMARY

Pernix Sleep, Inc.[3] and its affiliated debtors and debtors-in-possession (each a "**Debtor**" and collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended or modified, the "**Bankruptcy Code**") on February 18, 2019 (the "**Petition Date**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

On the Petition Date, the Debtors filed, among other pleadings: (i) the *Motion of Debtors for Entry of Orders (I)(a) Approving Sale Procedures for Sale of Debtors' Assets, (b) Approving Stalking Horse Bid Protections, (c) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (d) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (e) Approving Assumption and Assignment Procedures and (f) Granting Related Relief and (II)(a) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (b) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases and (c) Granting Related Relief* [D.I. 26] (the "**Bid Procedures Motion**"); and (ii) the *Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors (A) To Obtain Postpetition Financing and (B) To Use Cash Collateral, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* [D.I. 19] (the "**DIP Motion**").

On March 1, 2019, the Creditors' Committee was appointed by the Office of the United States Trustee.  Immediately upon formation of the Creditors' Committee, the Debtors and their advisors engaged extensively and constructively with the Creditors' Committee's advisors, assisting them in their diligence and analysis of the Debtors' history and their proposed restructuring including with respect to the Debtors' proposed sale and DIP financing.  Prior to the hearing on the Bid Procedures Motion and the final hearing on the DIP Motion, the Creditors' Committee notified the Debtors of certain concerns and informal objections to the relief sought in the Bid Procedures Motion and DIP Motion, as well as the Debtors other first and second day motions.

After extensive, good faith, arms' length negotiations among the Debtors, the Highbridge Parties and the Creditors' Committee (each a "**Party**" and together as the "**Parties**"), the parties entered into a settlement resolving the Creditors' Committees concerns as embodied by that certain *Term Sheet for Settlement with Official Creditors' Committee*, dated March 21, 2019 (the "**Term Sheet**").  The Term Sheet was approved by the Bankruptcy Court on April 4, 2019, pursuant to the *Order Approving Settlement Between the Debtors and Official Committee of Unsecured Creditors* [D.I. 253]

Following the Bankruptcy Court's approval of the Term Sheet, the Parties continued discussions surrounding the implementation of the Term Sheet pursuant to the proposed Plan and ultimately agreed to terms of the Global Settlement set forth in the Plan that resolves any outstanding implantation issues with respect to the Term Sheet, provides substantial consideration for the satisfaction of claims and the wind down of the Debtors' Estates and resolves other outstanding claims and objections in the case  The Term Sheet and the Global

---

[3] The Debtors are: Pernix Therapeutics Holdings, Inc., Pernix Therapeutics, LLC, Pernix Manufacturing, LLC, Pernix Sleep, Inc., Cypress Pharmaceuticals, Inc., Hawthorn Pharmaceuticals, Inc., Macoven Pharmaceuticals, L.L.C., Gaine, Inc., Respicopea, Inc., Pernix Ireland Limited, Pernix Ireland Pain Designated Activity Company, Pernix Holdco 1, LLC, Pernix Holdco 2, LLC, and Pernix Holdco 3, LLC.

Settlement form the foundation of the Plan, which provides for the liquidation of the Debtors' remaining assets, the preservation and ability to prosecute the Trust Causes of Action and the consensual and expedited wind-down of the Debtors' Estates and Confirmation of the Plan.

**IF THE TRANSACTIONS DESCRIBED IN THE GLOBAL SETTLEMENT ARE NOT APPROVED AND IMPLEMENTED, THE PLAN MAY NOT BECOME EFFECTIVE AND DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS AND INTERESTS MAY BE DELAYED, SIGNIFICANTLY REDUCED OR ELIMINATED ALTOGETHER.**

This Disclosure Statement describes the terms of the Plan, including the treatment of Claims against and Interests in the Debtors.  This Executive Summary is intended only to be a summary of the distributions provided for in the Plan.  **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY.**

Under the Plan, Claims against and Interests in the Debtor are divided into nine (9) classes as summarized in the table following this introduction.  Certain unclassified Claims will be paid in full in Cash to the extent they become Allowed Claims.  Allowed Priority Non-Tax Claims and Other Secured Claims, Prepetition Exchangeable Note Claims, General Unsecured Claims, Disputed Employee Litigation Claims, and Prepetition Treximet Highbridge Deficiency Claims may receive a distribution, as summarized in the following table setting forth the classification and treatment of the prepetition Claims and Interests under the Plan and the estimated percentage of recovery of Allowed Claims.  The classification and treatment for all Classes is described in more detail in Article III of the Plan.

Estimated Claim and Interest amounts set forth in the following table constitute the Debtors' current estimate after a preliminary review of certain Proofs of Claims filed against the Debtors and the Debtors' books and records.  The current aggregate amount of Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims and Other Secured Claims filed against the Debtors or otherwise known, which have not been satisfied, is approximately $51,000.00. Because the Bar Dates have not expired and the claims reconciliation process is in its earliest stages in these Chapter 11 Cases, the Debtors have not completed a detailed review of all Claims to determine their validity or any possible legal or equitable defenses, including setoff and recoupment, which are available to the estates.

**THERE CAN BE NO ASSURANCE THAT THE ACTUAL CLAIM AMOUNTS WILL NOT BE DIFFERENT, AND PERHAPS SIGNIFICANTLY DIFFERENT, FROM THE ESTIMATES SET FORTH HEREIN.**  The table beginning on the following page is only a summary of the classification of treatment of Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and Plan for a complete description and understanding of the classification and treatment of Claims and Interests.

**SUMMARY OF CLASSIFICATION AND TREATMENT
OF CLAIMS AND INTERESTS UNDER THE PLAN**

| CLAIMS/INTERESTS & DESCRIPTION | ESTIMATED ALLOWED CLAIMS | TREATMENT | ESTIMATED RECOVERY |
|---|---|---|---|
| Administrative Claims (unclassified) | $0.00 | Unimpaired | Estimated Recovery Percentage: **100%** Form of Recovery: Cash |
| Priority Tax Claims (unclassified) | $50,000 | Unimpaired | Estimated Recovery Percentage: **100%** Form of Recovery: Cash |
| DIP Claims | $5,900,000[4] | Unimpaired | Estimated Recovery Percentage: **100%** Form of Recovery:  Cash |
| Priority Non-Tax Claims (Class 1) | $2,000 | Unimpaired | Estimated Recovery Percentage: **100%** Form of Recovery: Cash |
| Other Secured Claims (Class 2) | $0.00 | Unimpaired | Estimated Recovery Percentage: **100%** Form of Recovery: Cash |
| RESERVED | N/A | N/A | N/A |
| RESERVED | N/A | N/A | N/A |
| Prepetition Exchangeable Note Claims (Class 5) | $36,500,000 | Impaired – Entitled to Vote | Estimated Recovery Percentage: **0%,** unless the Highbridge Participation Trigger occurs Form of Recovery: Class B Liquidating Trust Interests |
| General Unsecured Claims (Class 6) | $85,101,000 | Impaired – Entitled to Vote | Estimated Recovery Percentage: 3-5% Form of Recovery: Class A Liquidating Trust Interests |
| Disputed Employee Litigation Claims (Class 7) | Unliquidated/ Contingent | Impaired – Entitled to Vote | Estimated Recovery Percentage: 100%, ***if the Class 7 Stipulation is Approved by the Court*** Form of Recovery: Class 7 Cash Recovery<br><br>Estimated Recovery Percentage: Contingent, ***if Class 7 votes to reject Plan*** Form of Recovery, ***if Class 7 votes to reject Plan:*** To be Determined |
| Prepetition Treximet Highbridge Deficiency Claims (Class 8) | $142,183,253 | Impaired – Entitled to Vote | Estimated Recovery Percentage: **0%,** unless the Highbridge Participation Trigger occurs Form of Recovery: Liquidating Trust Class B Interests |

---

[4] The outstanding obligations relating to the DIP Claims will be used to fund the disbursements under the Plan and the winddown of the Debtors' estates – other than those obligations relating to the Liquidating Trust Interests and the Liquidating Trust – and any cash remaining will be paid in accordance with the Asset Purchase Agreement.

| Intercompany Claims (Class 9) | $558,000,000 | Impaired – Deemed to Reject | Estimated Recovery Percentage: **0%** Form of Recovery: None |
|---|---|---|---|
| Subordinated Claims (Class 10) | $0.00 | Impaired – Deemed to Reject | Estimated Recovery Percentage: **0%** Form of Recovery: None |
| Interests (Class 11) | N/A | Impaired – Deemed to Reject | Estimated Recovery Percentage: **0%** Form of Recovery: None |

# I.    INTRODUCTION

## 1.1    PURPOSE OF THE DISCLOSURE STATEMENT

The Debtors provide this Disclosure Statement to the Office of the United States Trustee and to all of the Debtors' known Creditors and Interest Holders pursuant to Bankruptcy Code section 1125(b) for the purpose of seeking confirmation of the Plan. A copy of the Plan is attached hereto as **Exhibit A**. By Order dated May 6, 2019, the Disclosure Statement received interim approval by the Bankruptcy Court. A hearing on the final approval of the Disclosure Statement and confirmation of the Plan will be held on June 20, 2019 at 2:00 p.m. (Eastern Time).

The Debtors strongly urge you to read this Disclosure Statement in its entirety before making any judgment about voting to either accept or reject the Plan because the Disclosure Statement contains a summary of the Plan and important information concerning the Debtors' history and operations. The Disclosure Statement also provides information regarding alternatives to the Plan. Summaries of the Plan are included herein for the purpose of seeking confirmation of the Plan and soliciting acceptances of the Plan and may not be relied upon for any purpose other than to make a judgment with respect to voting to either accept or reject the Plan.

**PLEASE NOTE THAT MUCH OF THE INFORMATION CONTAINED HEREIN HAS BEEN TAKEN, IN WHOLE OR IN PART, FROM INFORMATION CONTAINED IN THE DEBTORS' BOOKS AND RECORDS. STATEMENTS MADE IN THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, AND THE EXHIBITS ANNEXED TO THE PLAN. ALTHOUGH THE DEBTORS HAVE ATTEMPTED TO BE ACCURATE IN ALL MATERIAL RESPECTS, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ERROR. UNLESS OTHERWISE INDICATED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.**

**NO REPRESENTATION CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS ARE NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN, OR INCONSISTENT WITH, INFORMATION CONTAINED HEREIN AND IN THE PLAN.**

## 1.2    CONFIRMATION OF THE PLAN

**1.2.1    Requirements.** The requirements for Confirmation of the Plan are set forth in detail in Bankruptcy Code Section 1129. The following summarizes some of the pertinent requirements:

(a) **Acceptance by Impaired Classes.**  Except to the extent that the cram down provisions of Bankruptcy Code section 1129(b) may be invoked, each Class of Claims and each Class of Interests must either accept the Plan or be deemed to accept the Plan because the Claims or Interests of such Class are not Impaired.

(b) **Feasibility.**  The Bankruptcy Court is required to find that the Plan is likely to be implemented and that parties required to perform or pay monies under the Plan will be able to do so.

(c) **The "Best Interest" Test.**  The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must find that the Plan is in the "best interest" of all Creditors and Interest holders.  To satisfy this requirement, the Bankruptcy Court must determine that each holder of a Claim against, or Interest in, the Debtors: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a value not less than the amount such holder would receive if the Debtors' property was liquidated under Chapter 7 of the Bankruptcy Code on such date.

(d) **"Cramdown" Provisions.**  The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.  A plan may be confirmed under the cramdown provisions if, in addition to satisfying all other requirements of Bankruptcy Code section 1129(a), it (i) "does not discriminate unfairly," and (ii) is "fair and equitable," with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.  As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have specific meanings unique to bankruptcy law.

In general, the cramdown standard requires that a dissenting class receive full compensation for its allowed claim or interests before any junior class receives any distribution.  More specifically, Bankruptcy Code section 1129(b) provides that a plan can be confirmed under that section if: (a) with respect to a secured class, (i) the holders of such claims retain the liens securing such claims to the extent of the allowed amount of such claims and that each holder of a claim of such class receive deferred cash payments equaling the allowed amount of such claim as of the plan's effective date or (ii) such holders realize the indubitable equivalent of such claims; (b) with respect to an unsecured claim, either (i) the impaired unsecured creditor must receive property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class may not receive any property under the plan; or (c) with respect to a class of interests, either (i) each holder of an interest of such class must receive or retain on account of such interest property of a value, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any interest that is junior to the interest of such class may not receive or retain any property on account of such junior interest.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured class of claims or a class of interests receives full compensation for its allowed claims or allowed interests, no holder of claims or interests in any junior class may receive or retain any property on account of such claims or interests. With respect to a dissenting class of secured claims, the "fair and equitable"

standard requires, among other things, that holders either (i) retain their liens and receive deferred cash payments with a value as of the plan's effective date equal to the value of their interest in property of the estate, or (ii) otherwise receive the indubitable equivalent of these secured claims. The "fair and equitable" standard has also been interpreted to prohibit any class senior to a dissenting class from receiving under a plan more than 100% of its allowed claims. The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank.

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. The Debtors will also seek confirmation of the Plan over the objection of individual holders of Claims who are members of an accepting Class.

The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan, any exhibit or schedules thereto, or any Plan document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. The Debtors believe that the Plan will satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

**1.2.2 Procedure.** To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of Bankruptcy Code section 1129. The Bankruptcy Court has set June 20, 2019 at 2:00 p.m. (Eastern Time) for the combined hearing for final approval of this Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing").

**1.2.3 Objections to Final Approval of the Disclosure Statement and Confirmation of the Plan.** Any party-in-interest may object to the final approval of the Disclosure Statement and/or to confirmation of the Plan and appear at the Confirmation Hearing to pursue any such objection. The Court has set June 13, 2019, at 4:00 p.m. (Eastern Time), as the deadline for filing and serving any such objections to the final approval of the Disclosure Statement and/or to confirmation of the Plan. Any objections must be filed with the Bankruptcy Court at the following address:

U.S. Bankruptcy Court for the District of Delaware
824 Market Street, Third Floor
Wilmington, Delaware 19801

With a copy served upon counsel for the Debtors at the following address:

Eli J. Vonnegut *(Admitted pro hac vice)*
Christopher S. Robertson *(Admitted pro hac vice)*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017

- and –

Adam G. Landis, Esq.
Kerri K. Mumford, Esq.
Jennifer L. Cree, Esq.
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, DE  19801

**1.2.4**    **Effect of Confirmation.**  Except as otherwise provided in the Plan, Asset Purchase Agreement or in the Confirmation Order, Confirmation vests title to (i) all property of the Debtors' Estates, other than the Transferred Assets and the Liquidating Trust Assets, in the Post-Effective Date Debtors and (ii) all property of the Debtors' Estates constituting the Liquidating Trust Assets in the Liquidating Trust, to the same extent such Assets were held by the Debtors, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and interest holders, subject to the provisions of the Plan, the Term Sheet, the Asset Purchase Agreement and the Global Settlement.  Confirmation serves to make the Plan binding upon the Debtors, all Creditors, Interest holders and other parties-in-interest, regardless of whether they cast a ballot ("***Ballot***") to accept or reject the Plan.

**1.3**    **VOTING ON THE PLAN.**

**1.3.1**    **Impaired Claims or Interests.**  Pursuant to Bankruptcy Code section 1126, only the holders of Claims or Interests in Classes "Impaired" by the Plan may vote on the Plan.  Pursuant to Bankruptcy Code section 1124, a Class of Claims or Interests may be "Impaired" if the Plan alters the legal, equitable or contractual rights of the holders of such Claims or Interests treated in such Class.  The holders of Claims or Interests not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan.  The holders of Claims or Interests in any Class which will not receive any payment or distribution or retain any property pursuant to the Plan are deemed to reject the Plan, unless they have agreed otherwise, and, in either event, do not have the right to vote.  This Disclosure Statement is being distributed for informational purposes to all Creditors, the Debtors' Interest holders and parties-in-interest without regard to any such party's right to vote.

**1.3.2**    **Eligibility.**  In order to vote on the Plan, a Creditor or Interest holder must have timely filed or been assigned a timely filed proof of Claim, unless its Claim or Interest is scheduled by the Debtors and is not identified as disputed, unliquidated or contingent on the Debtors' Schedules of Assets and Liabilities (as amended, the "Schedules").  Creditors or Interest holders having a Claim or Interest in more than one Class that is entitled to vote may vote in each Class in which they hold a separate Claim or Interest by casting a Ballot in each Class.

**1.3.3**    **Binding Effect.**  Whether a Creditor or Interest holder votes on the Plan or not, such Person will be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court.  Absent some affirmative act constituting a vote, a Creditor or Interest holder will not be included in the vote: (i) for purposes of accepting or rejecting the Plan or (ii) for purposes of determining the number of Persons voting on the Plan.

**1.3.4**    **Procedure.**  Members of Class 5 (Prepetition Exchangeable Note Claims), Class 6 (General Unsecured Claims), Class 7 (Disputed Employee Litigation Claims), and Class

8 (Prepetition Treximet Highbridge Deficiency Claims) may vote to accept or reject the Plan. Members of Class 1 (Priority Non-Tax Claims) and Class 2 (Other Secured Claims) are unimpaired and deemed to accept the Plan. Members of Class 9 (Intercompany Claims), Class 10 (Subordinated Claims) and Class 11 (Interests) are deemed to reject the Plan. Accordingly, holders of Claims or Interests in Classes 1, 2, 9, 10 and 11 are not entitled to vote on the Plan. In order for your vote to count, you must complete, date, sign and properly mail the enclosed Ballot (please note that envelopes have been included with the Ballot) to:

> Pernix Sleep, Inc. Ballot Processing
> c/o Prime Clerk LLC
> One Grand Central Place
> 60 East 42nd Street (Park Avenue)
> Suite 1440
> New York, NY 10165

**BALLOTS SENT BY FACSIMILE, TELECOPY, ELECTRONIC MAIL OR OTHER FORM OF ELECTRONIC TRANSMISSION ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that original Ballots for the acceptance or rejection of the Plan must be received by mail or overnight delivery by Prime Clerk, LLC at the address set forth above on or before 11:59 p.m. (Eastern Time) on June 13, 2019. Once you have delivered your Ballot, you may not change your vote, except for cause shown to the Bankruptcy Court after notice and hearing.

Any Ballot received that is incomplete in anyway shall be deemed to be cast as follows:

(a) Ballots received that do not evidence the amount or evidence an incorrect amount of such Creditor's Claim shall be completed or corrected, as the case may be, based upon the Schedules filed by the Debtors if no proof of Claim or proof of Interest has been filed by such Creditor, or based upon timely filed proofs of Claim or proofs of Interest, and counted as a vote to accept or reject the Plan;

(b) Ballots received that do not identify the Creditor, whether or not signed by the Creditor holder, shall not be counted as a vote to accept or reject the Plan;

(c) Ballots received that do not reflect in which Class such Ballot is cast or incorrectly classify such Creditor's Claim and that are otherwise properly completed shall be completed or corrected, as the case may be, based upon the Schedules filed by the Debtors if no proof of Claim has been filed by such Creditor, or based upon timely filed proofs of Claim, and counted as a vote to accept or reject the Plan.

### 1.4     ACCEPTANCE OF THE PLAN

**1.4.1     Creditor Acceptance.** As a Creditor, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must accept the Plan, or the Plan must qualify for cramdown of any non-accepting Class of Claims pursuant to Bankruptcy Code section 1129(b). At least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Plan. To the extent you hold a claim in Class 5 (Prepetition Exchangeable Note Claim), Class 6 (General Unsecured Claims) or Class 7 (Disputed Employee Litigation Claims), you are urged to complete, date, sign and

promptly mail the enclosed Ballot.  Please be sure to complete the Ballot properly and legibly identify the exact amount of your Claim and the name of the Creditor.

> **1.4.2   Cramdown Election.**  As long as at least one Impaired Class votes to accept the Plan, excluding the votes of insiders, the Debtors may attempt to invoke the "cramdown" provisions.  Cramdown may be an available remedy, because the Debtors believe that, with respect to each Impaired Class, the Plan is fair and equitable within the meaning of Bankruptcy Code section 1129(b)(2) and does not discriminate unfairly.

## 1.5   SOURCES OF INFORMATION

The information contained in this Disclosure Statement has been obtained from the Debtors' books and records and from pleadings filed by the Debtors and other parties-in-interest. Every reasonable effort has been made to present accurate information and such information is believed to be correct as of the date hereof.  Any value given as to the Assets of the Debtors is based upon an estimation of such value.  You are strongly urged to consult with your financial, legal and tax advisors to understand fully the Plan and the Disclosure Statement.

The financial information contained in this Disclosure Statement is given as of the date hereof, unless otherwise specified.  The delivery of this Disclosure Statement does not, under any circumstance, imply that there has been no change in the facts set forth herein since such date.  This Disclosure Statement is intended, among other things, to summarize the Plan and must be read in conjunction with the Plan and its exhibits, if any.  If any conflicts exist between the Plan and the Disclosure Statement, the terms of the Plan shall control.

## 1.6   ADDITIONAL INFORMATION

Should you have any questions regarding the Plan or this Disclosure Statement, or require clarification of any information presented herein, please contact the following attorneys for the Debtors:

> Eli J. Vonnegut *(Admitted pro hac vice)*
> Christopher S. Robertson *(Admitted pro hac vice)*
> DAVIS POLK & WARDWELL LLP
> 450 Lexington Avenue
> New York, New York 10017
> Telephone: (212) 450-4000
>
>  - and –
>
> Adam G. Landis, Esq.
> Kerri K. Mumford, Esq.
> Jennifer L. Cree, Esq.
> LANDIS RATH & COBB LLP
> 919 Market Street, Suite 1800
> Wilmington, DE  19801
> Telephone: (302) 467-4400

## II.    THE DEBTORS

### 2.1    DESCRIPTION OF THE DEBTORS AND THE DEBTORS' BUSINESSES

The Debtors are a specialty pharmaceutical company focused on improving patients' lives by identifying, developing and commercializing differentiated products that address unmet medical needs.  The Debtors' products target underserved market segments, such as central nervous system indications, including neurology and pain, as well as other specialty therapeutic areas.

The Debtors' primary sales channel is through wholesalers, who sell the Debtors' products to retail drug stores, mass merchandisers and grocery store pharmacies in the U.S., who, in turn, sell the medications to customers.  The Debtors also sell products to members of group purchasing organizations, and certain customers also purchase the Debtors' products directly through the Pernix Prescriptions Direct program, which provides the Debtors' products to commercially insured customers through mail-order pharmacies at discounted rates.

Primarily, the Debtors sell three core branded products: Zohydro® ER with BeadTek™ ("**Zohydro**"), Silenor® ("**Silenor**"), and Treximet® ("**Treximet**").  Zohydro is an extended-release opioid for the management of severe pain, which—unlike its competitors—does not contain acetaminophen, reducing the risk for potential liver toxicity, and which is specifically designed to deter opioid abuse.  Silenor is the only non-narcotic, non-scheduled and non-addictive FDA-approved prescription sleep aid for the treatment of insomnia characterized by difficulty with sleep maintenance.  Finally, Treximet is the only FDA-approved acute migraine treatment combining two traditional migraine treatments to produce a unique synergistic therapeutic effect that provides superior sustained pain relief through its rapid release technology called RT Technology$^{TM}$.  In 2018, approximately 31% of the Company's consolidated net product revenues were attributable to Zohydro, 27% were attributable to Silenor and 22% were attributable to the branded Treximet product.  The Debtors also market a generic drug portfolio, consisting of the authorized generic version of Treximet, dietary supplements, medical foods and other products, through debtor- subsidiaries Macoven Pharmaceuticals, LLC ("**Macoven**") and Cypress Pharmaceuticals, Inc. ("**Cypress**"); this generic drug portfolio represented 20% of consolidated net revenues in 2018.

Historically, the Debtors' business model has focused on broadening its product portfolio through the acquisition of marketed specialty products or products close to achieving regulatory approval.  In August 2014, the Debtors acquired the U.S. intellectual property rights to Treximet from GlaxoSmithKline for $267 million.  In April 2015, the Debtors acquired the Zohydro product line from Zogenix, Inc. for upfront consideration consisting of $80 million of cash and 168,209 shares of Pernix common stock, plus certain contingent regulatory and commercial milestone payments of up to $283.5 million.  Other significant acquisitions are those of Pernix Sleep, including Silenor, in 2013 and Cypress, the Company's generic product distributor, in 2012.

In July 2018, Pernix Ireland Pain Designated Activity Company ("**PIP DAC**") acquired 10% of the equity in Nalpropion Pharmaceuticals, Inc. ("**Nalpropion**") for $7.35 million, plus an incremental $1.82 million contribution for working capital requirements, which was funded via the Prepetition DDTL Facility.  Nalpropion was formed by the Debtors, certain Highbridge affiliates and co-investors to acquire certain assets of Orexigen Therapeutics, Inc., including worldwide rights to Contrave® ("**Contrave**"), a prescription-only weight loss medication.

Pursuant to the Services Agreement, dated as of July 27, 2018 (as amended by Amendment No. 1 to Services Agreement, dated as of December 18, 2018, and Termination of Certain Services and Amendment No. 2 to Services Agreement, dated as of January 6, 2019, the "***Services Agreement***") between Nalpropion and Pernix Therapeutics, the Debtors are responsible for performing certain management and oversight services for Nalpropion. In addition, the Debtors are currently responsible for distributing Contrave in the United States under the Transitional Distribution Services Agreement, dated as of January 6, 2019 (the "***TSA***"), between Nalpropion and Pernix Therapeutics. Pernix Therapeutics receives a management fee under the Services Agreement and TSA equal to 5% of net sales of Contrave. The Company also has options to acquire up to 49.9% and 100% of Nalpropion at specified future times and purchase prices. Under the Services Agreement, on a monthly basis Pernix Therapeutics earns approximately $415,000 in management fees on account of its right to receive 5% of net sales of Contrave. Since Nalpropion was established, Pernix Therapeutics has earned a total of $2,073,906.55 in such management fees from August 2018 through December 2018 as well as receiving expense reimbursement from Nalpropion for Pernix's overhead costs of $1,945,833.82 in total.

For the twelve months ended December 31, 2018, the Debtors recorded consolidated net revenue of approximately $138.7 million. Excluding revenue related to Nalpropion, consolidated net revenue for 2018 was approximately $92.4 million, which represents approximately a 37% decrease from total consolidated 2017 net revenue. The year-over-year decline is largely attributable to the loss of patent exclusivity of Treximet in February 2018 and resulting generic competition together with the discontinuation of certain products, including IDA (as defined below) and desvenlafaxine. For the twelve months ended December 31, 2018, the Company posted a loss from operations of approximately $3 million on a consolidated basis.

Crucial to the distribution of the Debtors' unique suite of products, the Debtors currently employ a talented and dedicated workforce of twenty-eight (28) people in active status working full-time positions, including executives, business managers, human resource professionals, information technology specialists, administrative support staff and other personnel, who have enabled the Debtors to continue to achieve their goals of improving patients' lives. The Debtors' employees live and work primarily in New Jersey. None of the Debtors' employees are represented by a union.

Pernix is the direct or indirect parent company of each of the Debtors. Pernix's common stock is publicly traded on the Nasdaq Global Market under the symbol "PTX". The Company is headquartered in Morristown, New Jersey. The Company holds certain assets, including IP-related assets, owned in connection with the Treximet and Zohydro products in entities incorporated in Ireland (PIL and PIP DAC). PIL and PIP DAC maintain offices in Dublin, Ireland. In addition, Pernix, through PIP DAC, owns a 10% interest in non-Debtor Nalpropion.

## 2.2    THE DEBTORS' PREPETITION CAPITAL STRUCTURE

### Prepetition ABL

Pernix, Pernix Therapeutics, Pernix Sleep, Cypress, Macoven, Hawthorn Pharmaceuticals, Inc. ("***Hawthorn***"), Gaine, Inc. ("***Gaine***"), and Respicopea Inc. ("***Respicopea***") are each borrowers (the "***ABL Borrowers***") under that certain Credit Agreement, dated as of July 21, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "***Prepetition ABL Credit Agreement***"), by and among the ABL Borrowers, PIL, PIP DAC, Pernix Holdco 1, LLC, Pernix Holdco 2, LLC, and Pernix Holdco 3, LLC, as Guarantors, certain

funds managed by Highbridge, as lenders (the "*Prepetition ABL Lenders*"), and Cantor Fitzgerald Securities, as Administrative Agent (the "*Prepetition ABL Agent*").   As of the Petition Date, approximately $14.1 million in principal amount remained outstanding under the Prepetition ABL Credit Agreement.   Obligations arising under the Prepetition ABL Credit Agreement were secured by, among other things, first priority liens on and security interests in cash and cash equivalents, inventory and accounts receivable of the ABL Borrowers.

### *DDTL Credit Agreement*

PIP DAC, as borrower, is party to that certain Credit Agreement, dated as of July 21, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "*Prepetition DDTL Credit Agreement*"), by and among PIP DAC, certain funds managed by Highbridge, as lenders (the "*Prepetition DDTL Lenders*"), and Cantor Fitzgerald Securities, as Administrative Agent (the "*Prepetition DDTL Agent*").   As of the Petition Date, approximately $39.2 million in principal amount plus an additional $1.1 million of accrued pay-in-kind interest remains outstanding under the Prepetition DDTL Credit Agreement.   Obligations arising under the Prepetition DDTL Credit Agreement are secured by, among other things, first priority liens on and security interests in substantially all assets of PIP DAC, including assets relating to Zohydro, PIP DAC's equity interests in Nalpropion and cash held by PIP DAC.

### *The Prepetition Treximet Notes*

In August 2014, Pernix issued $220.0 million in aggregate principal amount of 12% senior secured notes (the "*Prepetition Treximet Notes*") under that certain Indenture, dated as of August 19, 2014, among Pernix, as Issuer, the Guarantors party thereto, and U.S. Bank National Association, as Trustee and Collateral Trustee (the "*Prepetition Treximet Notes Trustee*") (as amended, restated, supplemented or otherwise modified from time to time, the "*Prepetition Treximet Notes Indenture*").   Interest on the Prepetition Treximet Notes is payable on February 1 and August 1 of each year, and the Issuer is also required to pay an installment of principal of the Prepetition Treximet Notes in an amount equal to 50% of Net Sales (as defined in the Prepetition Treximet Notes Indenture) of Treximet for the two consecutive fiscal quarters ended prior to each payment date (less the amount of interest paid on the Prepetition Treximet Notes on such payment date).

On August 1, 2018, Pernix announced a series of transactions pursuant to which certain holders of the Prepetition Treximet Notes exchanged $12.2 million of Prepetition Treximet Notes for a combination of Pernix common and preferred equity.

As of the Petition Date, approximately $154 million in aggregate principal amount of the Prepetition Treximet Notes remain outstanding.   The Prepetition Treximet Notes are secured by a continuing first-priority security interest in substantially all of the assets of Pernix and the Guarantors party to the Prepetition Treximet Notes Indenture related to Treximet other than inventory and certain inventory related assets, including accounts arising from the sale of the inventory.

### *The Convertible Notes*

In April 2015, Pernix issued $130.0 million in aggregate principal amount of 4.25% Convertible Senior Notes due 2021 (the "*Prepetition Convertible Notes*") under that certain Indenture, dated as of April 22, 2015, between Pernix and Wilmington Trustee, National Association, as Trustee (the "*Prepetition Convertible Notes Trustee*") (as amended, restated,

supplemented or otherwise modified from time to time, the "***Prepetition Convertible Notes Indenture***"). The Prepetition Convertible Notes are unsecured and are not guaranteed by any party. As of the Petition Date, approximately $79 million in aggregate principal amount of the Prepetition Convertible Notes remain outstanding.

### The Exchangeable Notes

On July 20, 2017, each of the Debtors entered into an exchange agreement (the "***Exchange Agreement***") with certain funds managed by Highbridge that were holders of the Prepetition Convertible Notes pursuant to which $51.8 million of aggregate principal amount of Prepetition Convertible Notes held by such holders were exchanged for (i) $36.2 million aggregate principal amount of 4.25%/5.25% Exchangeable Senior Notes due 2022 (the "***Prepetition Exchangeable Notes***") issued by PIP DAC pursuant to that certain Indenture, dated as of July 21, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "***Prepetition Exchangeable Notes Indenture***") among PIP DAC, the guarantors party thereto and Wilmington Trust, National Association, as Trustee (the "***Exchangeable Notes Trustee***") and (ii) 1,100,498 shares of common stock of Pernix. The Prepetition Exchangeable Notes are unsecured and are guaranteed by all of the Debtors (other than PIP DAC). As of the Petition Date, approximately $35 million in aggregate principal amount of the Prepetition Exchangeable Notes remain outstanding.

### Intercompany Obligations

In August 2014, the corporate predecessor of PIL issued a $225 million promissory note to Pernix (the "***Treximet Intercompany Note***"). The proceeds from the issuance of the Treximet Intercompany Note were used by PIL to acquire the Treximet assets. Interest payable at 8% per annum and the principal amount outstanding on the Treximet Intercompany Note is due on August 19, 2020. The Treximet Intercompany Note is unsecured and not guaranteed by any party. As of December 31, 2018, approximately $294.75 million in aggregate principal amount and interest remain outstanding under the Treximet Intercompany Note. Additionally, in the ordinary course of business, the Debtors maintain relationships with each other that result in intercompany claims arising from various intercompany transactions, including, but not limited to, certain inventory transactions. These transactions are recorded in the Debtors' books and records. Specifically, Treximet, Treximet Pediatrics, Treximet AG, and Zohydro are acquired by the Debtors' Irish entities (PIL and PIP DAC) and, in turn, sold to certain Debtor entities in the U.S.

### Other Unsecured Debt

As of the Petition Date, the Debtors estimate that their unsecured debt, excluding amounts due in connection with the Prepetition Convertible Notes, Prepetition Exchange Notes or intercompany claims, is approximately $160 million, and consists primarily of accounts payable to vendors, accrued but unpaid expenses, claims under the Prepetition Convertible Notes , and Prepetition Treximet Deficiency Claims.

### Equity

Pernix, the ultimate parent of the Debtors, is a publicly held reporting company. As of the Petition Date, there were approximately 17,347,048 shares of Pernix's common stock issued and outstanding.

## 2.3    EVENTS LEADING TO THE BANKRUPTCY FILING

The Debtors have been seeking a long-term solution for its capital structure for some time. In order to consummate the acquisitions of Treximet and Zohydro in 2014 and 2015, respectively, the Debtors incurred significant indebtedness, including the Prepetition Treximet Notes and the Prepetition Convertible Notes. Due to a number of factors, including, but not limited to, net pricing and market dynamics in their respective therapeutic areas, these products have underperformed relative to expectations, rendering the Debtors overleveraged. As a result, in July 2016, the Debtors announced the reorganization of their senior management team and, shortly thereafter, commenced a formal process to review their strategic alternatives, including refinancing alternatives, asset sales and the sale of all or a portion of the Debtors. In October 2016, certain holders of the Prepetition Treximet Notes and Prepetition Convertible Notes agreed to enter into non-disclosure agreements with Pernix in order to facilitate discussions concerning a possible consensual restructuring of Pernix's capital structure. However, despite extensive negotiations, no agreement was reached.

On January 31, 2017, an arbitration tribunal issued its opinion in favor of Glaxo Group Limited, GlaxoSmithKline LLC, GlaxoSmithKline Intellectual Property Holdings Limited, and GlaxoSmithKline Intellectual Property Management Limited (collectively, "*GSK*"), awarding it damages and fees against Pernix and PIL in the amount of $35 million, plus interest, pertaining to litigation that arose from certain liabilities associated with the Treximet acquisition. As of the ruling date, Pernix had already paid to GSK, or into an escrow account, an aggregate of $16.5 million, resulting in a net outstanding liability of $18.5 million. This resulted in Wells Fargo Bank, National Association ("*Wells Fargo*"), as Administrative Agent under the Debtors' former $50 million asset-based revolving credit facility (the "*Wells Fargo Facility*"), creating a reserve and reducing the Debtors' borrowing base.

Facing the near-term maturity of the Wells Fargo Facility, in early 2017, the Debtors considered various strategic and refinancing alternatives including an asset sale exploration process that included contacting over one hundred (100) potentially interested parties. The Debtors also explored potential solutions with its existing creditors, including Highbridge, (through certain affiliated funds), a significant holder of the Prepetition Convertible Notes, at that time. Following extensive negotiations, on July 20, 2017, the Company and Highbridge announced several financing transactions, which included the refinancing of the Wells Fargo Facility with the Prepetition ABL Credit Agreement, entry into the Prepetition DDTL Credit Agreement and the issuance of approximately $36.2 million aggregate principal amount of Prepetition Exchangeable Notes and 1,100,498 shares of Pernix's common stock to Highbridge in exchange for Highbridge's tender of $51.8 million aggregate principal amount of Prepetition Convertible Notes. PIP DAC borrowed $30 million under the Prepetition DDTL Credit Agreement at closing, and the Prepetition DDTL Lenders committed to lend an additional $15 million in the future for certain specified purposes, including to finance certain acquisitions. In addition, Pernix and PIL contemporaneously entered into an amended settlement agreement with GSK, pursuant to which Pernix and PIL would be obligated to make payments totaling $6.65 million, plus certain payments in the event that Pernix redeemed, repurchased, or exchanged Prepetition Convertible Notes at greater than 31.00 cents for every one dollar of such notes outstanding, in satisfaction of the remaining approximately $21.2 million unpaid portion of the amount owing to GSK.

Upon closing the refinancing transactions and entry into the amended settlement with GSK, the Debtors expected to have sufficient liquidity through the end of 2019 and access to capital to continue to pursue their strategies for future growth, which involved growing or maintaining sales of the existing products in their portfolio and acquiring additional marketed specialty products or products close to regulatory approval to leverage their existing platform.

However, in late 2017 and into early 2018, the Debtors were confronted with the loss of two of the largest products in their generics portfolio. First, Macoven distributed a combination product called isometheptene mucate, dichlorphenazone, and acetaminophen, ("***IDA***"), which was originally approved in 1948 by the FDA, for safety only. IDA's efficacy as an adjunct treatment for peptic ulcer disease, as well as other medical conditions, such as migraine headaches, was reviewed under the FDA's Drug Efficacy Study Implementation process and the FDA required an approved new drug application in order for them to continue to be distributed and required distribution to cease. Second, in December 2017, Pernix was notified by Osmotica Pharmaceutical Corp. ("***Osmotica***") that the manufacturer that it had contracted with to manufacture KHEDEZLA™ (desvenlafaxine) tablets destroyed all of Pernix's desvenlafaxine Active Pharmaceutical Ingredient ("***API***") without consent. Pernix then learned that its API supplier no longer manufactured this material and did not intend to resume production. Neither Pernix or Osmotica were able to identify an alternative source of suitable API, and as a result Pernix proceeded to discontinue the product. For the year ended December 31, 2017, the Debtors' net sales from the sale of these two products were approximately $18 million in the aggregate, or approximately 12% of total net sales. Losing this revenue stream had a significant impact on the business and operating cash flow in 2018.

In addition, 2018 proved to be more challenging than expected due to issues relating to Treximet and Zohydro. With respect to Treximet, four patents covering Treximet expired in February 2018, enabling up to three generic competitors to enter the market. In anticipation of the impending loss of exclusivity for Treximet, the Debtors frequently convened a task force throughout 2017 dedicated to the commercialization of the authorized generic version of Treximet. That task force developed certain assumptions regarding the pricing for a generic version of Treximet as well as how managed care organizations would treat the branded version of Treximet within their contracts and rebate programs once generic versions of Treximet were available. The launch of generic versions of Treximet by third parties did not proceed as expected in certain key respects. The Debtors anticipated three generic entrants shortly after the expiration of the Treximet patents in February 2018. In fact, only one competitor promptly entered the market in February 2018, while the two others did not launch until August 2018. However, the first entrant came to market with a much lower price than anticipated, which dramatically impacted Pernix's ability to profitably market its own generic version of Treximet. The effects of the lower than expected generic price were compounded by the fact that, because there were only two generics for Treximet (the third-party product and Pernix's authorized generic), managed care organizations did not adjust the maximum allowable cost of the branded Treximet product in April as expected, forcing Pernix to pay higher rebates until late 2018. These rebates on the branded product, plus the lower than expected generic price, resulted in significantly lower than anticipated profitability for the Treximet franchise in 2018.

Regarding Zohydro, a key threat arose during 2018 that compromised the integrity of the intellectual property supporting market exclusivity of the product. On August 27, 2018, the United States District Court for the District of Delaware determined, in Pernix's litigation against

Alvogen Malta Operations, Ltd. ("*Alvogen*"), that two patents relating to Zohydro are invalid. As a result, absent a reversal of the decision on appeal, pursuant to a previous settlement agreement dated September 29, 2016, between Alvogen and Recro Gainsville LLC, Alvogen will be able to launch a generic version of Zohydro, subject to final approval of an Abbreviated New Drug Application by the Food and Drug Administration, as early as October 1, 2019.

Due to the culmination of the events in late 2017 and 2018, the Debtors' ability to enter into strategic transactions (notwithstanding the Nalpropion transaction), such as marketing and sales partnerships, and to access additional liquidity and the capital markets were significantly constrained. Without the ability to expand its business inorganically or enter into partnerships, the Debtors initiated a strategic operational review, including a potential reduction in the size of its sales force. In addition, the Debtors recognized that, given their current product mix and scale, it would be difficult to continue to support their funded debt obligations going forward and generate the cash flow needed to be a going concern.

With that backdrop, Pernix took a number of steps in order to enhance operations and improve liquidity. Since mid-2016, the Debtors have consummated multiple operational initiatives in an attempt to develop a sustainable capital structure through a dual focus on reducing operating costs and expanding its product portfolio. On July 7, 2016, the Company announced a reduction of its full-time work force by approximately 23% in order to optimize resources and improve the effectiveness of its sales force by consolidating its neurology and pain sales forces under one management structure. Subsequently, on January 5, 2018, the Company announced a further reduction of its total full-time workforce by approximately 22% due to the impending loss of exclusivity of Treximet in February 2018.

In addition, as a result of the above-referenced negative events, in the fall of 2018, the Debtors engaged Guggenheim Securities, LLC ("*Guggenheim Securities*"), Davis Polk & Wardwell LLP ("*Davis Polk*") and Ernst & Young LLP ("*E&Y*") to assist management with their review of strategic alternatives. In November 2018, the Debtors reached out to the largest holders of the Debtors' funded debt, Highbridge and Deerfield Management Company, L.P. ("*Deerfield*"), to initiate discussions regarding potential restructuring transactions. Highbridge promptly agreed to engage, executed a non-disclosure agreement and, over the following weeks and months, dedicated significant time and resources to conducting due diligence and cooperatively developing a restructuring strategy with the Company.

Initially, and following extensive negotiations, Highbridge agreed to offer the Debtors a package proposal under which, among other benefits, (1) Highbridge would provide DIP financing to the Debtors on favorable below-market terms, (2) Highbridge would provide stalking horse asset bids for substantially all of the Debtors' assets structured to permit a fulsome and competitive auction process with minimal bid protections for Highbridge, and (3) Highbridge agreed to waive all interest payments due by the Debtors to Highbridge from the date of the proposal through February 1, 2019. Highbridge's initial proposal also required the Debtors to enter into an amendment to the Services Agreement and a TSA with Nalpropion, under which the Debtors and Nalpropion agreed to cooperate to transfer distribution services for Contrave to a third party distributor, while ensuring that the Debtors continue to receive distribution payments even following such transition. Under the TSA, the Debtors granted Nalpropion a second lien on the assets securing the Prepetition ABL Credit Agreement to secure the Company's obligations under the TSA. The high-level terms of this proposal were set forth in a term sheet (the "*Highbridge Term Sheet*"), dated January 6, 2019. The Debtors had the

option to accept or reject this proposal at any time after February 12, 2019 and prior to February 28, 2019.

Following the receipt of the Highbridge Term Sheet, Deerfield and other holders of the Prepetition Treximet Notes, (the "*Trex Group*"), purporting to represent approximately 80% of the outstanding Prepetition Treximet Notes engaged with the Debtors regarding a restructuring proposal.  The Debtors' advisors provided diligence and guidance to the Trex Group and worked with and guided both Highbridge and the Trex Group in an effort to enhance their proposals for DIP financing and asset purchases as much as possible, with respect to overall value and other business and legal terms. Ultimately, at the conclusion of this auction, while both the Trex Group and Highbridge had advanced and improved their proposals, the Debtors' Board concluded that the overall value offered by the substantially enhanced Highbridge proposal represented the best option available to the Debtors.

Ultimately, this proposal formed the basis of the Asset Purchase Agreement and DIP Financing, as outlined in the Debtors various bankruptcy filings.

## 2.4    THE DEBTORS' BANKRUPTCY PROCEEDINGS

### 2.4.1    The Petition Date.  On February 18, 2019 (the "*Petition Date*"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

### 2.4.2    The First Day Operational Orders.  On the Petition Date, the Debtors filed several motions seeking certain operational relief by virtue of so-called first day orders. The first day orders assisted the Debtors in transitioning into operating as debtors-in-possession by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval.  The first day orders in the Chapter 11 Cases authorized, among other things:

- the continued maintenance of the Debtors' bank accounts, continued use of existing business forms and continued use of the Debtors' existing cash management system;
- the appointment of Prime Clerk as the noticing agent in these Chapter 11 Cases;
- honoring existing customer sales and related programs;
- continued utility service during the pendency of these Chapter 11 Cases;
- continued maintenance of existing insurance policies, continued payment of premiums and renewal of insurance policies and entrance into new policies, as necessary;
- continued payment of certain prepetition taxes, governmental assessments and related fees;
- payment to certain critical vendors,
- establishing procedures for the sale or transfer of the Debtors' securities and
- payments to employees for accrued prepetition wages, salaries and benefits.

### 2.4.3    The DIP Orders.  On the Petition Date, the Debtors filed the DIP Motion, seeking Bankruptcy Court approval of the DIP Financing Facility and to utilize cash collateral of the various prepetition lenders.  On February 21, 2019, the Bankruptcy Court granted the DIP Motion on an interim basis [D.I. 61].  On April 15, 3018, the Bankruptcy Court entered the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors  to Obtain Postpetition Financing and (II) Authorizing*

*Use of Cash Collateral, (III) Granting Liens and Superiority Claims (IV) Granting Adequate Protection and (V) Granting Related Relief* [D.I. 318] (the "***Final DIP Order***").

As set forth in the Final DIP Order, the DIP Lenders agreed to "carve-out" from their collateral certain amounts (the "***Carve-Out***") including, among other amounts: (i) all fees payable to the Clerk of the Court and all statutory fees payable to the U.S. Trustee; (ii) fees, expenses and costs of attorneys, accountants and other professionals retained in the Chapter 11 Cases by the Debtors or the Creditors' Committee, subject to the Approved Budget (as defined in the Final DIP Order) and (iii) post-termination fees of certain professionals.  In addition, the Final DIP Order provides that the Carve-Out is senior in priority to all of the Debtors' other secured debt.

**2.4.4    The Sale Transaction.**   As explained above, the Debtors filed their Chapter 11 Cases to engage in a process to sell substantially all of their assets so that they could maximize the value of their Estates for the benefit of all of their constituents and preserve their ongoing business.  To that end, on the Petition Date, the Debtors filed the Bid Procedures Motion.  Through the Bid Procedures Motion, the Debtors sought Bankruptcy Court approval of the Sale pursuant to the Asset Purchase Agreement or a subsequent higher or otherwise better offer.

On March 22, 2019, the Bankruptcy Court entered the *Order (I) Approving Sale Procedures For Sale of Debtors' Assets, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (IV) Approving Form and Manner of Notice of Sale, Auction and Sale Hearing, (V) Approving Assumption and Assignment Procedures, and (VI) Granting Related Relief* [D.I. 191] (the "***Bid Procedures Order***").  The Bid Procedures Order approved, among other things, the procedures for the Debtors to solicit and obtain the highest or otherwise best bid for their assets through an auction process.

Following entry of the Bid Procedures Order, the Debtors received no competing bids. On April 15, 2019, the Court entered the Sale Order approving the Sale.  The Sale closed on April 30, 2019.

On April 30, 2019, the Debtors and the Buyer entered into that certain Amendment No. 1 to the Amended and Restated Asset Purchase Agreement, which was approved on the Court on May 6, 2019. [D.I. 388] (the "***Amendment***").  Pursuant to the Amendment, the Transferred Assets was revised to include all D&O Claims (as defined in the Amendment) for an additional cash payment of $500,000 to be held in escrow for the benefit of unsecured creditors and part of the Trust Cash Amount.

**2.4.5    The Bar Date Motion.**  On March 15, 2019, the *Motion of the Debtors for Entry of an Order (A) Establishing Bar Dates for Filing Proofs of Claim; (B) Approving the Form and Manner for Filing Proofs of Claim and (C) Approving Notice Thereof* [D.I. 134] (the "***Bar Date Motion***").  On April 4, 2019, the Bankruptcy Court entered the *Order Granting Motion of the Debtors for Entry of an Order (A) Establishing Bar Dates for Filing Proofs of Claim; (B) Approving the Form and Manner for Filing Proofs of Claim; and (C) Approving Notice Thereof* [D.I. 254] (the "***Bar Date Order***").  Pursuant to the Bar Date Order, each person or Entity asserting (i) a Claim against the Debtors that arose (or was deemed to have arisen) before the Petition Date and/or (ii) any right to payment constituting a cost or administrative expense of administration of the Debtors' Chapter 11 Cases that arose, accrued, or otherwise

became due and payable or may have arisen, accrued or otherwise become due and payable at any time during the period from the Petition Date through and including April 30, 2019, are required to file proofs of claim against the Debtors on or before June 3, 2019 at 4:00 p.m. (Eastern Time). Additionally, pursuant to the Bar Date Order, the Bankruptcy Court has established August 19, 2019 at 4:00 p.m. (Eastern Time) as the deadline for all governmental units holding claims (whether secured, unsecured priority or unsecured non-priority) that arose (or are deemed to have arisen) before the Petition Date to file proofs of claim.

**2.4.6   Schedules and SOFAs.**   On April 2, 2019, the Debtors filed their *Statements of Financial Affairs* [Docket Nos. 221,223, 226, 225, 228, 230, 232, 234, 236, 238, 240, 242, 244 and 246] and *Schedules of Assets and Liabilities* [D.I.s. 222, 224, 227, 229, 231, 233, 235,237,239, 241,243, 245, 247 and 248] (as amended or modified and together as, the "***Schedules and Statements***").

**2.4.7   The Creditors' Committee.**   On March 1, 2019, the Office of the United States Trustee (the "***U.S. Trustee***") appointed the Official Committee of Unsecured Creditors in the Chapter 11 Cases (the "***Creditors' Committee***") consisting of: Telemetry Securities LLC, 683 Capital Partners, LP, Medicine to Go Pharmacies, Inc., and certified class, Chad Myers and Jeffrey Hartzler, on behalf of themselves and others similarly situated in Adv. No. 19-50107, and Walgreen Co [D.I. 96]. The Creditors' Committee engaged the law firms Akin Gump Strauss Hauer & Feld LLP and Potter Anderson & Corroon LLP as its counsel and Province, Inc as its financial advisor and subsequently filed motions to retain the foregoing [D.I.s 204-206].

## 2.5   SECURED CLAIMS ENCUMBERING THE DEBTORS' PROPERTY

**2.5.1   The Other Secured Claims**.   Other Secured Claims consist of any Secured Claim that is not a DIP Facility Claim, Prepetition ABL Secured Claim, Prepetition DDTL Secured Claim or Prepetition Secured Treximet Claim. As of the Petition Date, the Debtors owed approximately $0.00 on account of the Other Secured Claims.

**2.5.2   The DIP Claims**.   On the Petition Date, and pursuant to the various orders approving the same, the Debtors entered into the DIP Financing Facility. As part of the DIP Financing Facility, the Prepetition ABL Secured Claims were "rolled-up" into the DIP Financing Facility. The DIP claims are secured by first priority liens on and security interests in substantially all of the Debtors' assets, subject to the Carve-Out. Subject to the consummation of the Sale and the credit bids contained therein, the only obligations outstanding will be those arising out of the Asset Purchase Agreement.

**2.5.3   The Prepetition DDTL Secured Claims**.   As described above, the Debtors owed the Prepetition DDTL Lenders approximately $39.2 million in principal, plus an additional $1.1 million of accrued PIK interest. The Prepetition DDTL Secured Claims were secured by first priority liens on and security interests in substantially all assets of PIP DAC, subject to the Carve-Out. Upon closing of the Sale, the Prepetition DDTL Secured Claims were satisfied.

**2.5.4   The Prepetition Secured Treximet Note Claims.**   As described above, Pernix owed approximately $154 million in aggregate principal amount under the Prepetition Treximet Notes, plus accrued interest and fees. The Prepetition Secured Treximet Note Claims were secured by a first priority liens on and security interests in substantially all of the assets of Pernix Ireland Limited related to Treximet other than the ABL Collateral (as defined in the Prepetition ABL Credit Agreement), and the Guarantors thereunder related to Treximet, other

than inventory and certain inventory related assets.  Upon closing of the Sale, the Prepetition Secured Treximet Note Claims were satisfied.

**2.6    ADMINISTRATIVE CLAIMS.**

**2.6.1    Administrative Claims.** Administrative Claims are Claims that are actual and necessary costs and expenses of preserving the Debtors' Estates and operating the business incurred in the ordinary course of business during the pendency of the Debtors' cases on or before the Effective Date.  The Debtors estimate such Administrative Claims, excluding Professional Fee Claims and Section 503(b)(9) Claims, as of the date hereof, to be approximately $0.00.

**2.6.2    Professional Fee Claims.** Professional Fee Claims are Administrative Claims for the compensation of the Debtors' or the Creditors' Committee's professionals or other entities for professional services rendered or expenses incurred in the Debtors' cases on or before the Effective Date.  All payments to Professionals for Professional Fee Claims will be made in accordance with the procedures established in the Bankruptcy Code, the Bankruptcy Rules, the United States Trustee Guidelines and the Bankruptcy Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses, subject to the terms of the Committee Professional Fee Cap. The Bankruptcy Court will review and determine all applications for compensation for services rendered and reimbursement of costs.

**2.7    UNSECURED CLAIMS AGAINST THE DEBTORS**

**2.7.1    Unsecured Priority Claims.** According to the Debtors' Schedules and Statements as well as certain Claims filed to date, the Debtors estimate that they owe approximately $49,500 on account of tax Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(8).  The Debtors' estimate that Priority Claims outstanding for employee wages and benefits total approximately $1,700.

**2.7.2    Unsecured Nonpriority Claims.** The Debtors' Schedules and Statements reflect aggregate unsecured nonpriority Claims against the Debtors in the approximate amount of $85,100,800, plus certain unknown amounts scheduled as contingent, unliquidated and disputed, but excluding amounts paid pursuant to various Bankruptcy Court orders and/or assumed or otherwise satisfied in connection with the Sale.

**III.    SUMMARY OF THE CHAPTER 11 PLAN[5]**

**3.1    IN GENERAL**

The Plan provides for the liquidation of the Debtors' remaining assets following the sale of substantially all of the Debtor's Assets to the Buyer, pursuant to the Bid Procedures, under Bankruptcy Code section 363 pursuant to the Asset Purchase Agreement.

Pursuant to Bankruptcy Code sections 363 and 1123 and Bankruptcy Rule 9019, the provisions of the Plan shall also constitute a good faith compromise of the claims and Causes of Action asserted or that could have been asserted among the Creditors' Committee, Debtors, and Highbridge.  After extensive good faith, arms' length negotiations among the Debtors, the Creditors' Committee, and Highbridge, the parties reached a global settlement which provides

---

[5] In the event of any inconsistency or discrepancy between this summary of the Plan, on the one hand, and the actual terms and provisions of the Plan, on the other hand, the terms and provisions of the Plan shall govern for all purposes.

for the implementation of the UCC Settlement and resolves all outstanding issues amongst the parties (the "Global Settlement").

If the Plan is confirmed by the Bankruptcy Court and consummated, except to the extent that a holder of an Allowed Administrative Claim and the Debtors agree to less favorable treatment with respect to such holder, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the Effective Date.  Further, the Plan provides that, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee as of the Effective Date.

With respect to holders of Allowed Priority Tax Claims, and except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors, one of the following treatments: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable non-bankruptcy law and to the extent provided for by Bankruptcy Code section 511; or (ii) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

All other Allowed Claims and Allowed Interests will receive a distribution only to the extent set forth below in sections 3.2, 3.3 and 3.4.

### 3.2    CLASSIFICATION OF CLAIMS AND INTERESTS

**3.2.1    Class 1: Priority Non-Tax Claims.**  This Class consists of all Priority Non-Tax Claims, which are any Claim against the Debtors, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under Bankruptcy Code section 507(a).  Class 1 is Unimpaired by the Plan, and each holder of a Class 1 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

**3.2.2    Class 2: Other Secured Claims.**  This Class consists of any Claim, other than a DIP Claim, Prepetition DDTL Secured Claim, or Prepetition Secured Treximet Claims, that is (a) secured by a Lien on property in which the Estates have an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to Bankruptcy Code section 553, to the extent of the value of the creditor's interest in the Estates' interests in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a) or (b) Allowed as such pursuant to the Plan.  Class 2 is Unimpaired by the Plan, and each holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

**3.2.3    Class 3: RESERVED.**

**3.2.4    Class 4: RESERVED.**

**3.2.5    Class 5: Prepetition Exchangeable Note Claims.**  This Class consists of Allowed Prepetition Exchangeable Note Claims.  Class 5 is Impaired by the Plan and entitled to vote.

**3.2.6    Class 6: General Unsecured Claims.**  This Class consists of any Claim Claim against a Debtor that (i) is neither Secured nor entitled to priority under the Bankruptcy

Code or an order of the Bankruptcy Court and (ii) is not a DIP Claim, Prepetition Treximet Highbridge Deficiency Claim, Prepetition DDTL Secured Claim, Prepetition Exchangeable Note Claim, Disputed Employee Litigation Claim, Administrative Claim, a Professional Fee Claim, Priority Tax Claim, a Priority Non-Tax Claim, Other Secured Claim, Intercompany Claim, Subordinated Claim or an Interest.  For the avoidance of doubt, General Unsecured Claims include, but are not limited to, any Claim under the Prepetition Convertible Notes and any Prepetition Treximet Deficiency Claim.  Class 6 is Impaired by the Plan and entitled to vote.

3.2.7   **Class 7: Disputed Employee Litigation Claims.**  This Class consists of any Claim arising from or related to the *Class Action Adversary Proceeding Complaint* [Adv. Proc. 19-501012, D.I. 1],or the subject matter thereof.  Notwithstanding anything to the contrary in the Plan, any Allowed Disputed Employee Litigation that is determined by a Final Order to be a Priority Non-Tax Claim shall be paid out of the Liquidating Trust Assets.  Class 7 is Impaired by the Plan and entitled to vote.

3.2.8   **Class 8: Prepetition Treximet Highbridge Deficiency Claim.**  This Class consists of all Claims under the Prepetition Treximet Notes owned by any Highbridge Party as of the Claims Bar Date that is not an Allowed Prepetition Secured Treximet Claim.  Class 8 is Impaired by the Plan and entitled to vote.

3.2.9   **Class 9: Intercompany Claims.**  This Class consists of any Claim against a Debtor held by another Debtor.  Class 9 is Impaired by the Plan, and each holder of a Class 9 Intercompany is deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g).

3.2.10  **Class 10: Subordinated Claims.**  This Class consists of any Claim that is subject to subordination, including any Claims arising from rescission of a purchase or sale of a Security of any Debtor or an Affiliate of any Debtor, which Security is not an Interest, for damages arising from the purchase or sale of such a Security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.  Class 10 is Impaired by the Plan, and each holder of a Class 10 Subordinated Claim is deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g).

3.2.11  **Class 11: Interests.**  This Class consists of any equity security in any of the Debtors as defined in Bankruptcy Code section 101(16), including all issued, unissued, authorized or outstanding shares of capital stock of the Debtors together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.  Class 11 is Impaired by the Plan, and each holder of a Class 11 Interest is deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g).

## 3.3   TREATMENT OF UNIMPAIRED CLAIMS AND CLASSES

3.3.1   **Administrative Claims.**  Except to the extent that a holder of an Allowed Administrative Claim and the Debtors agree to less favorable treatment with respect to such holder, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the earlier of the date that is (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date or (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed, if such Administrative Claim is not Allowed as of the Effective Date.

3.3.2   **Professional Fee Claims.**  Any Person asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Debtors, Highbridge,

the Committee and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or any other applicable order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim no later than twenty-one (21) days after the Effective Date (with an objection period of at least twenty one days for objections, if any, to such applications); provided, however that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professional Order may continue to receive such compensation or reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professional Order. Objections to any Professional Fee Claim must be Filed and served on the requesting party no later than twenty-one (21) days from the service of an application for final allowance of a Professional Fee Claim. On the Effective Date, the Professional Fee Claim Reserve shall be transferred by the Debtors to Landis Rath & Cobb LLP's IOLTA account to be held for the distribution of Allowed Professional Fee Claims. Upon entry of a Final Order approving any such application for such Professional Fee Claim, Landis Rath & Cobb LLP shall promptly distribute from the Professional Fee Claim Reserve any unpaid portion of such Allowed Professional Fee Claim. To the extent that any Cash is remaining in the Professional Fee Claim Reserve after payment in full of all Allowed Professional Fee Claims, Landis Rath & Cobb LLP shall promptly transfer any such Cash to the Plan Administrator.

Notwithstanding anything contained in the Plan or the Confirmation Order, the aggregate amount of the Allowed Professional Fee Claims of the Creditors' Committee and the fees and expenses of the Liquidating Trustee shall be limited to Committee Professional Fee Cap.

3.3.3    **Priority Tax Claims.**  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or as otherwise provided in the Asset Purchase Agreement, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, at the option of the Debtors, one of the following treatments: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable non-bankruptcy law and to the extent provided for by Bankruptcy Code section 511; or (ii) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

3.3.4    **DIP Claims.**  Pursuant to the Global Settlement and conditioned upon closing of the Sale and approval of the Global Settlement by Final Order, the Highbridge Parties have agreed to waive any and all distributions (other than, for the avoidance of doubt, any distribution made pursuant to the Sale Order) in connection with any Allowed DIP Claim other than the amounts to be repaid in connection with the Asset Purchase Agreement.

3.3.5    **Statutory Fees.**  On the Effective Date, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee as of the Effective Date.

3.3.6    **Class 1: Priority Non-Tax Claims.**  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, and release of each Allowed Priority Non-Tax Claim, each holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash.

3.3.7    **Class 2: Other Secured Claims.**  Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final

satisfaction, settlement, and release of each Allowed Other Secured Claim, each holder of Allowed Other Secured Claim shall either (i) be paid in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim; (ii) receive all Collateral in possession of the Debtors securing the respective holder's Allowed Other Secured Claim; (iii) reinstatement of such Claim; or (iii) any other treatment rendering such Claim Unimpaired for purposes of the Bankruptcy Code, including returning the collateral underlying such Claim to the Holder.

### 3.3.8    Class 3: RESERVED.

### 3.3.9    Class 4: RESERVED.

## 3.4    TREATMENT OF IMPAIRED CLASSES

### 3.4.1    .Class 5: Prepetition Exchangeable Note Claims. Pursuant to the UCC Settlement, and pursuant to and conditioned upon the approval of the Global Settlement by Final Order, each holder of such Allowed Prepetition Exchangeable Note Claim shall receive its *pro rata* share of Class B Liquidating Trust Interests.

### 3.4.2    Class 6: General Unsecured Claims. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each holder of such Allowed General Unsecured Claim shall receive: its *pro rata* share of the Class A Liquidating Interests.

### 3.4.3    Class 7: Disputed Employee Litigation Claims.    Except to the extent that a holder of an Allowed Disputed Employee Litigation Claim agrees to a less favorable treatment, each Allowed Disputed Employee Litigation Claim shall receive:

   a. **If the Class 7 Stipulation is approved by the Court,** its *pro rata* share of an Allowed Priority Non-Tax Claim in the aggregate amount of $300,000 (the "***Class 7 Cash Recovery***"). The Class 7 Cash Recovery shall be satisfied from the Trust Cash Amount and from no other assets. If Class 7 votes to accept the Plan, such a vote will be deemed an agreement that the Disputed Employee Litigation Claims shall be entitled to solely the Class 7 Cash Recovery, and no other claims, priority or otherwise.

   b. **If Class 7 votes to reject the Plan,** the Court will determine the amount and priority of each Disputed Employee Litigation Claim.

### 3.4.4    Class 8: Prepetition Treximet Highbridge Deficiency Claim. Pursuant to the UCC Settlement, and pursuant to and conditioned upon the approval of the Global Settlement by Final Order, each Allowed Prepetition Treximet Highbridge Deficiency Claim shall receive its *pro rata* share of Class B Liquidating Trust Interests.

### 3.4.5    Class 9: Intercompany Claims. Holders of Intercompany Claims will receive no distribution under the Plan.

### 3.4.6    Class 10: Subordinated Claims. Holders of Subordinated Claims will receive no distribution under the Plan.

### 3.4.7    Class 11: Interests. Holders of Interests in the Debtors will receive no distribution under the Plan.

### 3.5    IMPLEMENTATION OF THE PLAN

**3.5.1    Vesting of Assets**.  Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan, on the Effective Date, (i) all the Remaining Estate Assets shall vest in the Post-Effective Date Debtors, free and clear of all Liens, Claims against, charges or other encumbrances, and (ii) all of the Liquidating Trust Assets shall vest in the Liquidating Trust.  After the consummation in full of the Plan with respect to the Post-Effective Date Debtors, the Residual Value shall be deemed Liquidating Trust Assets.

**3.5.2    Sources of Consideration for Plan Distributions.**  Distributions under the Plan, other than distributions to on account of Liquidating Trust Interests, will be funded by the Remaining Estate Assets.  Distributions on account of Liquidating Trust Interests will be funded by the Liquidating Trust Assets.  The Disclosure Statement indicates that the total Trust Cash Amount is $4.1 million.  For the avoidance of doubt, if the Class 7 Stipulation is approved by the Court, the Trust Cash Amount will be reduced by $300,000, and as such, the Trust Cash Amount will be $3.8 million.  Further, the Debtors estimate that holders of Prepetition Convertible Note Claims comprise about 90% of the General Unsecured Claim pool.

**3.5.3    Post-Effective Date Debtors.**  The Debtors shall continue in existence after the Effective Date as the Post-Effective Date Debtors solely for the purposes of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating all assets, if any, held by the Post-Effective Date Debtors, (2) resolving any Disputed Claims other than General Unsecured Claims and Disputed Employee Litigation Claims, (3) paying Allowed Claims other than payments of such claims on account of Liquidating Trust Interests, (4) filing appropriate tax returns, and (5) administering the Plan in an efficient manner.  The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.  The Post-Effective Date Debtors and the Plan Administrator shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

**3.5.4    Plan Administrator.**  The Plan Administrator shall act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of directors or managers and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, all persons acting as directors, managers, and officers of the Post-Effective Date Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole director or manager and the sole officer of each Post-Effective Date Debtor and shall succeed to the powers of the Post-Effective Date Debtor's managers and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors.  For the avoidance of doubt, the foregoing shall not limit the authority of the Post-Effective Date Debtors or the Plan Administrator, as applicable, to continue the employment any former director, manager, or officer.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to make distributions thereunder and wind down the

businesses and affairs of each Debtor and each Post-Effective Date Debtor, as applicable, including:  (1) liquidating, receiving, holding, investing, supervising, and protecting the remaining assets of each Post-Effective Date Debtor, including, without limitation, facilitating the sale of any of the Remaining Estate Assets; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (3) making distributions as contemplated under the Plan to holders of Allowed Claims, other than any such payments on account of Liquidating Trust Interests; (4) establishing and maintaining bank accounts in the name of the Post-Effective Date Debtors, as applicable; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to their responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors; (7) administering and paying taxes of the Post-Effective Date Debtors, including filing tax returns; (8) representing the interests of the Post-Effective Date Debtors before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (9) exercising such other powers as may be vested in it pursuant to an order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time on thirty (30) days written notice Filed with the Bankruptcy Court; *provided that* such resignation shall only become effective upon the appointment by the Bankruptcy Court of a permanent or interim successor Plan Administrator. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Post-Effective Date Debtors shall be terminated.

  i. **Appointment of the Plan Administrator**. The Plan Administrator shall be appointed pursuant to the Confirmation Order.

  ii. **Compensation of the Plan Administrator.**  The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement.

  iii. **Post-Effective Date Debtors' Expenses.**  Notwithstanding anything to the contrary in the Plan, all fees, expenses, and disbursements of the Plan Administrator in connection with the wind down and dissolution of the Debtors' businesses and affairs and the Post-Effective Date Debtors, as applicable, shall be funded from the Remaining Estate Assets.  For the avoidance of doubt, the Plan Administrator's compensation, and the payment of fees and expenses of any attorneys, accountants, and other professionals engaged by the Plan Administrator, if any, shall be funded from the Remaining Estate Assets.

  iv. **Wind Down.**  On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall take any and all actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. From and after the Effective Date, the Debtors (1) for all purposes shall be deemed to have withdrawn its business operations from any state in which the Debtors were previously conducting, or is registered or licensed to conduct, its business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to the Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The Filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

    **v.**   **Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation.** The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Post-Effective Date Debtors. The Plan Administrator may obtain, at the expense of the Post-Effective Date Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Post-Effective Date Debtors. The Plan Administrator may rely upon written information previously created or generated by the Debtors.

    **3.5.5**   **Tax Returns.** After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for the Debtors, and, pursuant to Bankruptcy Code section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of the Debtors or their Estates for any tax incurred during the administration of such Debtors' Chapter 11 Cases, as determined under applicable tax laws.

    **3.5.6**   **Dissolution of the Post-Effective Date Debtors.** Upon a certification to be filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Post-Effective Date Debtors shall be deemed to be dissolved without any further action by the Post-Effective Date Debtors, including the filing of any documents with the secretary of state for the state in which the Post-Effective Date Debtors are formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtors in and withdraw the Post-Effective Date Debtors from applicable states.

    **3.5.7**   **Liquidating Trust.**

    i.   **Creation of Liquidating Trust**. On the Effective Date, the Liquidating Trust shall be created in accordance with the Liquidating Trust Agreement to be included in the Plan Supplement and funded by the Debtors' transfer

to the Liquidating Trust of the Liquidating Trust Assets. The Liquidating Trust shall be a newly-formed Delaware trust with no prior assets or liabilities. The Liquidating Trustee shall serve as the trustee of the Liquidating Trust.

ii. **Transfers to the Liquidating Trust**.

    a. On the Effective Date, the Debtors and their Estates shall transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust, the Liquidating Trust Assets, which transfer shall be free and clear of Claims and Liens and contractually imposed restrictions except as otherwise provided herein.

    b. Notwithstanding anything to the contrary herein, to the extent the Liquidating Trust (or the Creditors' Committee, on behalf of the Liquidating Trust) is unable, prior to the Effective Date, to either (x) retain a law firm to bring Trust Causes of Action on a contingency fee basis, (y) obtain litigation financing to pursue the Trust Causes of Action, or (z) otherwise arrange to finance the Trust Causes of Action other than from the Trust Cash Amount, then the Liquidating Trust shall be deemed to have abandoned such Trust Causes of Action to the Post-Effective Date Debtors on the Effective Date.

iii. **The Liquidating Trustee**. From and after the Effective Date, the Liquidating Trustee shall be appointed pursuant to the Liquidating Trust Agreement, Plan, and Confirmation Order, until death, resignation or discharge and the appointment of a successor Liquidating Trustee in accordance with the terms of the Liquidating Trust Agreement. The Liquidating Trustee shall be the exclusive trustee of the Debtors' Estates under Title 11 for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 601(b)(3).

iv. **Responsibilities of the Liquidating Trustee**. The responsibilities of the Liquidating Trustee under the Liquidating Trust Agreement and the Plan shall include those set forth in the Liquidating Trust Agreement, including, without limitation, the following (a) the receipt of the Liquidating Trust Assets; (b) the establishment and maintenance of such operating, reserve and trust account(s) as are necessary and appropriate to carry out the terms of the Liquidating Trust; (c) the investment of Cash that is a Liquidating Trust Asset; (d) the pursuit of objections to, estimation of and settlements of General Unsecured Claims and Disputed Employee Litigation Claims, regardless of whether such Claim or Interest is listed on the Debtors' Schedules, other than Claims or Interests that are Allowed pursuant to the Plan; (e) the prosecution, settlement or abandonment of any Trust Causes of Action; (f) unless otherwise provided in the Plan, the calculation and distribution of all distributions to be made under the Plan to holders of Liquidating Trust Interests; and (g) such other responsibilities as may be vested in the Liquidating Trustee pursuant to the Plan, the Liquidating Trust Agreement, the Confirmation Order, other

Bankruptcy Court Orders, or as otherwise may be necessary and proper to carry out the provisions of the Plan. The Liquidating Trustee shall be responsible for the filing of all required tax returns and operating reports and the paying of taxes due the Liquidating Trust and all other obligations on behalf of the Liquidating Trust, if any.

v. **Powers of Liquidating Trustee**. The powers of the Liquidating Trustee, as set forth in the Liquidating Trust Agreement shall include, without limitation and without further Bankruptcy Court approval, each of the following:

a. With respect to any Liquidating Trust Asset, to exercise in a manner not inconsistent with the Plan all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by any member, officer, director or shareholder of the Debtor with like effect as if authorized, exercised and taken by unanimous action of such officers, directors and shareholders, including, without limitation, the dissolution of the Debtor;

b. To maintain accounts, to make distributions to holders of Liquidating Trust Interests provided for or contemplated in the Plan; and take other actions consistent with the Plan and the implementation thereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate reserves, in the name of the Liquidating Trustee;

c. Except to the extent set forth in the Plan, to object to any General Unsecured Claim or Disputed Employee Litigation Claim regardless of whether such Claim was Disputed on the Effective Date, to compromise or settle any General Unsecured Claim or Disputed Employee Litigation Claim regardless of whether such General Unsecured Claim or Disputed Employee Litigation Claim was Disputed on the Effective Date, prior to objection without supervision or approval of the Bankruptcy Court, free of any restriction of the Bankruptcy Code, the Bankruptcy Rules, and the local rules of the Bankruptcy Court, other than those restrictions expressly imposed by the Plan, the Confirmation Order or the Liquidating Trust Agreement;

d. To make decisions, without further Bankruptcy Court approval, regarding the retention or engagement of professionals, employees and consultants by the Liquidating Trust and the Liquidating Trustee and to pay the fees and charges incurred by the Liquidating Trustee on the Liquidating Trust's behalf on or after the Effective Date for fees and expenses of professionals (including those retained by the Liquidating Trustee), disbursements, expenses or related support services relating to the Liquidating Trust;

e. To file, if necessary, any and all tax and information returns required with respect to the Liquidating Trust as a grantor trust

pursuant to Treas. Reg. 1.671-4(a) or otherwise, (ii) make tax elections by and on behalf of the Liquidating Trust, and (iii) pay taxes, if any, payable by the Liquidating Trust.

f.   To take all other actions not inconsistent with the provisions of the Plan which the Liquidating Trustee deems reasonably necessary or desirable with respect to administering the Plan;

g.   To implement and/or enforce all provisions of the Plan, including entering into any agreement or executing any document required by or consistent with the Plan, the Confirmation Order and the Liquidating Trust Agreement;

h.   To abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization of its choice, any Liquidating Trust Asset if the Liquidating Trustee concludes they are no benefit to the Estate;

i.   Except as otherwise set forth herein, to prosecute and/or settle Trust Causes of Action for the benefit of holders of Liquidating Trust Interests, with or without approval of the Bankruptcy Court, and exercise, participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction and participate as a party or otherwise in any administrative, arbitrative or other nonjudicial proceeding and pursue to settlement or judgment such actions;

j.   To purchase or create and carry all insurance policies and pay all insurance premiums and costs the Liquidating Trustee deems necessary or advisable;

k.   To collect and liquidate and/or distribute all Liquidating Trust Assets pursuant to the Plan, the Confirmation Order and the Liquidating Trust Agreement;

l.   To hold any legal title to any and all of the Liquidating Trust Assets;

m.   If any of the Liquidating Trust Assets are situated in any state or other jurisdiction in which the Liquidating Trustee is not qualified to act as trustee, to nominate and appoint a Person duly qualified to act as trustee in such state or jurisdiction and require from each such trustee such security as may be designated by the Liquidating Trustee in its discretion; confer upon such trustee all the rights, powers, privileges and duties of the Liquidating Trustee hereunder, subject to the conditions and limitations of the Liquidating Trust Agreement, except as modified or limited by the Liquidating Trustee and except where the conditions and limitations may be modified by the laws of such state or other jurisdiction (in which case, the laws or the state or jurisdiction in which the trustee is action shall prevail to the extent necessary); require such trustee to be answerable to the Liquidating Trustee for all monies, assets and other property that may be received in connection with the administration of all property; and remove such trustee, with or

without cause, and appoint a successor trustee at any time by the execution by the Liquidating Trustee of a written instrument declared such trustee removed from office, and specifying the effective date and time of removal;

n. Retain any and all Insurance Policies of the Debtor providing coverage with respect to Trust Causes of Action; and

o. Exercise such other powers as may be vested in or assumed by the Liquidating Trustee pursuant to the Plan, the Liquidating Trust Agreement, the Confirmation Order, other orders of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of the Plan.

Solely with respect to any Liquidating Trust Asset, the Liquidating Trustee shall stand in the same position as the Debtors with respect to any claim the Debtors may have to an attorney-client privilege, the work-product doctrine, or any other privilege, and the Liquidating Trustee shall succeed to all of the Debtors' rights to preserve, assert or waive any such privilege.

vi. **Compensation of the Liquidating Trustee**.  The Liquidating Trustee shall be compensated pursuant to the terms of the Liquidating Trust Agreement, subject to the Committee Professional Fee Cap.  Any professionals retained by the Liquidating Trustee shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred, subject to approval by the Liquidating Trustee and subject to the Committee Professional Fee Cap.  The payment of fees and expenses of the Liquidating Trustee and its professionals shall be made in the ordinary course of business and shall not be subject to Bankruptcy Court approval.  The identity of the Liquidating Trustee and its proposed compensation for each shall be disclosed in the Plan Supplement.

vii. **Trust Causes of Action.**  The Liquidating Trustee shall have the sole right to pursue any existing or potential Trust Causes of Action, by informal demand and/or commencement of litigation.

viii. **Effective Date.**  On the Effective Date, the Liquidating Trustee shall have the rights and powers set forth herein and in the Liquidating Trust Agreement in order to carry out and implement the purposes and intent of the Plan.

**3.5.8  Cancellation of Existing Securities.**  Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan, on the Effective Date, the obligations of the Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes and purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors related thereto shall be cancelled and deemed null and void; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim against the Debtors shall continue in effect solely for purposes of (1) enabling holders of Allowed Claims to receive distributions

under the Plan as provided herein and (2) allowing the Unsecured Indenture Trustees to enforce their rights, claims, and interests vis-à-vis any parties other than the Debtors; (3) allowing the Unsecured Indenture Trustees to make the distributions in accordance with the Plan (if any), as applicable; (4) preserving any rights of the Unsecured Indenture Trustees to payment of fees, expenses, and indemnification obligations solely as against any money or property distributable to the Holders under the relevant indenture, including any rights to priority of payment and/or to exercise charging liens; (5) allowing the Unsecured Indenture Trustees to enforce any obligations owed to each of them under the Plan; (6) allowing the Unsecured Indenture Trustees to exercise rights and obligations relating to the interests of the Holders under the relevant indentures consistent with the terms of the Plan; (7) allowing the Unsecured Indenture Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including, but not limited, to enforce the respective obligations owed to such parties under the Plan; and (8) permitting the Unsecured Indenture Trustees to perform any functions that are necessary to effectuate the foregoing; provided, further, however, that the preceding provision shall not result in any expense or liability to the Debtors, except to the extent set forth in or provided for under this Plan.

3.5.9 __Indemnification Obligations__.  Except as otherwise provided in the Plan, the Confirmation Order, any and all indemnification obligations of the Debtors, whether pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document, or other document or applicable law, shall be rejected as of the Effective Date of the Plan.

3.5.10 __Effectuating Documents; Further Transactions.__  Prior to the Effective Date, the Debtors and their respective directors, members, trustees, officers, and managers are and, after the Effective Date, the Post-Effective Date Debtors are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorizations, or consents, except for those expressly required pursuant to the Plan, or any further notice to or action, order, or approval of the Bankruptcy Court.

3.5.11 __Exemption from Certain Taxes and Fees.__  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

3.5.12 __Treatment of Causes of Action.__  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, Asset Purchase Agreement, Global Settlement, or a Bankruptcy Court order, the Debtors reserve any and all Causes of Action (other than Trust Causes of Action or Causes of Action transferred to Buyer pursuant to the Asset Purchase Agreement) whether arising before or after the Petition Date, and preserve the right to commence, prosecute, or settle such Causes of

Action, notwithstanding the occurrence of the Effective Date.  The Post-Effective Date Debtors may pursue such Causes of Action, other than the Trust Causes of Action or Causes of Action transferred to Buyer pursuant to the Asset Purchase Agreement, in their sole discretion.  The Liquidating Trust may pursue the Trust Causes of Action in its sole discretion.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Post-Effective Date Debtors, the Buyer or the Liquidating Trust will not pursue any and all available Causes of Action against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action as a consequence of the Confirmation or Consummation.

### 3.6   FUNDING AND DISBURSEMENTS

**3.6.1   Disbursing Agents.**  The Plan Administrator shall make all distributions under the Plan on account of Allowed Claims, other than to holders of Liquidating Trust Interests, against the Debtors, provided, however, that all Allowed Professional Fee Claims shall be paid out of the Professional Fee Reserve.  All distributions to holders of Liquidating Trust Interests shall be made by the Liquidating Trustee pursuant to the terms of the Plan, Confirmation Order and the Liquidating Trust Agreement.

**3.6.2   Unclaimed Funds.**

**i.   Unclaimed Property of the Post-Effective Date Debtors**.   The Plan Administrator shall establish the Unclaimed Property Reserve for all Unclaimed Property for Claims, other than Liquidating Trust Interests.  Such Unclaimed Property shall be in held in a reserve, for a period of thirty (30) days, for the recipients of the beneficial interests in the Post-Effective Date Debtors under the terms of this Plan and Confirmation Order.   Once the distribution to Creditors, other than holders of Liquidating Trust Interests, becomes Unclaimed Property, the Plan Administrator shall, subject to the limitations set forth herein, (a) hold such Unclaimed Property in the Unclaimed Property Reserve solely for the benefit of such holder or holders who have failed to claim such Unclaimed Property and (b) release the Unclaimed Property from the Unclaimed Property Reserve and deliver to the holder entitled thereto upon presentation of proper proof by such holder of its entitlement thereto.  After the expiration of thirty (30) days, the holders of Allowed Claims, other than Claims in classes entitled to Liquidating Trust Interests, theretofore entitled to such Unclaimed Property shall cease to be entitled thereto and shall be entitled to no further distribution under this Plan, and such Claims shall be deemed disallowed and expunged in their entirety and the funds shall be redistributed to the other holders of Allowed Claims in accordance with the terms of the Plan, and Confirmation Order.  Such funds shall not be subject to the escheat laws of any state.

**ii.   Unclaimed Property of the Liquidating Trust**.  The Liquidating Trustee shall establish the Unclaimed Property Reserve for all Unclaimed Property for Liquidating Trust Interests.  Such Unclaimed Property shall be in held in a reserve, for a period of thirty (30) days, for the recipients of the

Liquidating Trust Interests.    Once the distribution to holders of Liquidating Trust Interests becomes Unclaimed Property, the Liquidating Trustee shall, subject to the limitations set forth herein, (a) hold such Unclaimed Property in the Unclaimed Property Reserve solely for the benefit of such holder or holders who have failed to claim such Unclaimed Property and (b) release the Unclaimed Property from the Unclaimed Property Reserve and deliver to the holder entitled thereto upon presentation of proper proof by such holder of its entitlement thereto. After the expiration of thirty (30) days, the holders of Liquidating Trust Interests theretofore entitled to such Unclaimed Property shall cease to be entitled thereto and shall be entitled to no further distribution under the Plan, and such Liquidating Trust Interests shall be deemed disallowed and expunged in their entirety and the funds shall be redistributed to the other holders of Liquidating Trust Interests in accordance with the terms of the Plan, Confirmation Order and Liquidating Trust Agreement.  Such funds shall not be subject to the escheat laws of any state.

3.6.3    **Cash Payments**.  Cash payments made pursuant to the Plan shall be in U.S. funds, by the means agreed to by payor and payee, including by check or wire transfer or, in the absence of an agreement, such commercially reasonable manner as the Liquidating Trustee shall determine in his or her sole discretion.

3.6.4    **Distribution for Allowed Claims**.  Except as otherwise provided in the Plan or the Confirmation Order, or as otherwise ordered by the Bankruptcy Court, distributions to Allowed Claims shall be made on the Distribution Date, or as soon after as practicable.

No holder of a Disputed Claim shall have any Claim against the Plan Administrator, the Post-Effective Date Debtors, the Liquidating Trustee, the Liquidating Trust, the Debtors or the Estates with respect to such Disputed Claim until such Disputed Claim becomes an Allowed Claim, and no holder of a Disputed Claim shall have any right to interest on such Disputed Claim except as provided in the Plan.

3.6.5    **Interest and Charges**.  No interest shall accrue or be paid on Allowed Claims.

3.6.6    **Compliance with Tax Requirements**.  In connection with the Plan, to the extent applicable, the Plan Administrator and the Liquidating Trust shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Plan Administrator and the Liquidating Trust shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, including, without limitation, requiring that the holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each holder or establishing any other mechanisms they believe are reasonable and appropriate.  The Plan Administrator and the Liquidating Trust reserve the right to allocate all distributions made under

the Plan in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

The Plan Administrator and the Liquidating Trust shall not be required to make distributions on any Allowed Claim if the holder thereof has not provided all documentation necessary to determine all tax withholding and reporting requirements for such Allowed Claim. To the extent such documentation is not provided within thirty (30) days of the respective Distribution Date, the distribution on such Allowed Claim shall be deemed Unclaimed Property.

**3.6.7  Fractional Dollars: De Minimis Distributions**. Notwithstanding any other provision of the Plan, the Liquidating Trustee shall not be required to make distributions or payments of fractions of dollars, and whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made shall reflect a rounding down of such fraction to the nearest whole dollar. In addition, the Liquidating Trustee shall not be required to may any distribution in an amount less than $50.00. To the extent that such a distribution shall be called for as part of any interim distribution, the Liquidating Trustee shall establish a reserve for all distributions in the amount of less than $50.00 and shall, when and if the holder of a Claim Interest is entitled to a distribution of $50.00 or more, make such distribution at such time. The Liquidating Trustee shall not be required to make any Final Distribution of less than $50.00 and all monies otherwise payable in such amount shall be paid to the other holders of Allowed Claims, in accordance with the terms of the Plan, the Confirmation Order and the Liquidating Trust Agreement.

**3.6.8  Delivery of Distributions to Holders of Allowed Claims**. Distributions to holders of Allowed Claims shall be made at the address set forth in the Schedules unless such addresses are superseded by proofs of claim or transfers of claims filed pursuant to Bankruptcy Rule 3001 or at the last known address of such holders if the Plan Administrator or the Liquidating Trustee have been notified in writing of a change of address. If the distribution to any holder of an Allowed Claim is returned to the Plan Administrator or the Liquidating Trustee as undeliverable or otherwise unclaimed, such Unclaimed Property shall be held in a reserve as set forth in Section V.B of the Plan.

If there is any residual Unclaimed Property at the time of the dissolution of the Liquidating Trust, such residual Unclaimed Property shall be available for a subsequent Distribution or donated to a charitable organization at the sole discretion of the Liquidating Trustee.

**3.6.9  No Penalty Claims**. Unless otherwise specifically provided for in the Plan, the Bankruptcy Code (including Section 507(a)(8)G)) or the Confirmation Order, no holder of any Claim will be entitled to allowance of, or to receive any payment on account of, any penalty arising with respect to or in connection with such Claim and any such penalty shall be deemed disallowed and expunged.

**3.6.10  Setoffs and Recoupment**. The Plan Administrator or the Liquidating Trust may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant pursuant to Bankruptcy Code section 558 or otherwise, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Liquidating Trust of any such Claim it may have against the holder of such Claim.

3.6.11 **Distributions by Liquidating Trust.**  The Liquidating Trustee shall not be obligated to make a distribution that would impair the ability of the Liquidating Trust to pay the expenses incurred by the Liquidating Trust.

3.6.12 **Claims Paid or Payable by Third Parties.**

i. **Claims Paid by Third Parties.**  The Plan Administrator and the Liquidating Trustee shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or Liquidating Trust.  To the extent a holder of such Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtors or the Liquidating Trust on account of such Claim, such holder shall repay, return or deliver any distribution to the Plan Administrator or the Liquidating Trust, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The Liquidating Trust and the Debtors' Estates reserve all of their rights, remedies, claims and actions against any such holders who fail to repay or return any such distribution.

ii. **Claims Payable by Third Parties.**  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to the Debtors' Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

iii. **Applicability of Insurance Policies.**  Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.  For the avoidance of doubt, nothing in the Plan, any of the Plan Documents, or finding of fact or conclusion of law in the Confirmation Order shall in any way operate to, or have the effect of, impairing or modifying the insurers' legal, equitable, or contractual rights, if any, in any respect.  The rights of insurers shall be determined under their respective Insurance Policy and/or settlement agreements as applicable.  Further, following the occurrence of the Effective Date, nothing shall prevent the insurers from seeking or continuing to seek, as may be applicable, any declaratory relief concerning their rights and obligations under their respective insurance policies under any forum.

### 3.6.13 <u>Delivery of Distributions to Holders of Prepetition Convertible Notes Claims and Prepetition Exchangeable Note Claims.</u>

Except as otherwise provided in the Plan, or reasonably requested by the Unsecured Indenture Trustees, all distributions to Holders of Allowed Prepetition Convertible Notes Claims and Prepetition Exchangeable Notes Claims shall be deemed completed when made to the Unsecured Indenture Trustees; <u>provided</u> that non-Cash consideration shall not be distributed in the name of the Unsecured Indenture Trustees. The Unsecured Indenture Trustees shall hold or direct such distributions for the benefit of the respective Holders of Allowed Prepetition Convertible Notes Claims and Prepetition Exchangeable Notes Claims. As soon as practicable in accordance with the requirements set forth in this Article V, the Unsecured Indenture Trustees shall arrange to deliver such distributions to or on behalf of such Holders in accordance with the Prepetition Convertible Notes Indenture and the Prepetition Exchangeable Notes Indenture, as applicable, subject to the rights of the Unsecured Indenture Trustees to assert their charging lien. If the Unsecured Indenture Trustees are unable to make, or consent to the Post-Effective Date Debtors or the Liquidating Trustee, as applicable, making such distributions, the Post-Effective Date Debtors or the Liquidating Trustee, with the cooperation of the Unsecured Indenture Trustees, shall make such distributions to the extent practicable. The Unsecured Indenture Trustees shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and Liquidating Trustee shall seek the cooperation of DTC so that any distribution on account of an Allowed Prepetition Convertible Notes Claim or Prepetition Exchangeable Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made to the extent possible through the facilities of DTC on the Effective Date or as soon as practicable thereafter. The Unsecured Indenture Trustees shall retain all rights under the Prepetition Convertible Notes Indenture and the Prepetition Exchangeable Notes Indenture, as applicable, to exercise their charging lien against distributions to their respective Holders.

### 3.7    GLOBAL SETTLEMENT

### 3.7.1    <u>Global Settlement</u>.

The Plan includes and effectuates, a good faith compromise of claims and Causes of Action (the "*Global Settlement*") asserted by the Creditors' Committee, and by and against, the Debtors, and the Highbridge Parties, as well as of any potential disputes related to the allocation of available value as among the Debtors' different stakeholders, as contemplated by the UCC Settlement and this Plan. In particular, the Highbridge Parties have agreed to, among other things, (a) pay cash in the amount of $3.6 million to fund the Liquidating Trust for the benefit of holders of General Unsecured Claims; (b) release their respective liens, claims and rights to any Preserved Avoidance Actions; and (c) waive their right to participate in any distribution on account of the Prepetition Exchangeable Note Claims and the Prepetition Treximet Highbridge Deficiency Claims, until the occurrence of the Highbridge Participate Right Trigger. In addition, the Buyer (a Highbridge Party) served as the stalking horse bidder for substantially all of the Debtors' assets, providing the Debtors with a path to a value-maximizing and expedient resolution to these chapter 11 cases. Moreover, the DIP Lenders (each a Highbridge Party) agreed to fund the Debtors' post-Closing wind down budget on the terms set forth in the Asset Purchase Agreement. In return for the foregoing, the Highbridge Parties are receiving releases as set forth in Article VIII of the Plan.

In connection with the Global Settlement, the Creditors' Committee has obtained significant value for general unsecured creditors, who given the Debtors' capital structure, would likely receive no recovery or a substantially diminished recovery absent the consideration provided pursuant to the Global Settlement, including the substantial consideration provided by

the Highbridge Parties.  Likewise, the Creditors' Committee has preserved the Trust Causes of Action for the holders of Liquidating Trust Interests further enhancing their potential overall recovery.  Overall, the Global Settlement ends potentially expensive, extensive and time consuming litigation over the respective parties' rights and interests in the Debtors' assets; provides for an expedited and efficient wind down of the Debtors' Estates for the benefit of all stakeholders, and provides significant recovery to the Debtors' general unsecured creditors.

Pursuant to Bankruptcy Code section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan implementing the Global Settlement constitute a good faith compromise and settlement of all Released Claims against the Released Parties, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve such compromise and Global Settlement, to release all of the Released Claims belonging to the Debtors and any other Person that is deemed to have given a release pursuant to Section VIII.E of the Plan against each and every Released Party.  Distributions to be made pursuant to the Plan shall be made on account of and in consideration of the Global Settlement.  Entry of the Confirmation Order shall confirm the Bankruptcy Court's approval of the Global Settlement, as of the Effective Date, of all components of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of the Debtors, the Post-Effective Date Debtors, their respective Estates, and the holders of Claims and Interests, and is fair, equitable and reasonable.

Notwithstanding anything to the contrary herein, Venable, LLP and Fitzpatrick, Cella, Harper & Scinto, L.L.P. shall have Allowed General Unsecured Claims in the respective amounts of $168,653.51 and $302,966.47 for attorneys' fees and expenses incurred in respect of prepetition legal services provided to the Debtors, in full satisfaction of, and free from any offset, challenge, claim or cause of action, in respect of, in connection with or related to Venable's and FC's provision of such legal services

### 3.8    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**3.8.1    <u>Rejection of Executory Contracts and Unexpired Leases</u>.**  Except as otherwise expressly set forth herein, on the Effective Date, all Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected previously by the Debtors; (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to assume Filed on or before the Effective Date; or (iv) has been designated by the Buyer as a "Transferred Contract" pursuant to the terms of the Asset Purchase Agreement, <u>provided</u>, <u>however</u>, that (i) the New Jersey Office Lease shall be deemed rejected as of the date that is six (6) months following the closing of the Sale and (ii) the Federal Supply Schedule Contract Federal Supply Schedule Contract 36F79718D0413, dated May 1, 2018, by and between Department of Veterans Affairs and Pernix Therapeutics, LLC. Federal Supply Schedule Contract V797D-40109, dated March 1, 2014, by and between Department of Veterans Affairs and Macoven Pharmaceuticals, LLC shall be deemed rejected on December 15, 2019.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejection of such Executory Contracts or Unexpired Leases pursuant to Bankruptcy Code sections 365(a) and 1123.  Unless otherwise indicated, rejection of Executory Contracts and Unexpired Leases pursuant to the Plan shall be effective as of the Effective Date.

**3.8.2    Claims Based on Rejection of Executory Contracts or Unexpired Leases.**  Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within twenty-one (21) days after the earlier of (a) service of Notice of the Effective Date, or (b) service of notice of entry of an order of the Bankruptcy Court (other than the Confirmation Order) approving the rejection of a particular Executory Contract or Unexpired Lease on the counterparty thereto.  The Notice of the Effective Date shall indicate, except as otherwise expressly set forth herein, that all Executory Contracts and Unexpired Leases that do not fall into one of the four clauses set forth in Article VII.A hereof are deemed rejected as of the Effective Date.  The Notice of Effective Date shall also set forth the deadline for filing Proofs of Claim with respect to the same.  Absent order of the Court to the contrary, any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed by the applicable deadline will not be considered Allowed and such person or entity shall not be treated as a creditor for purposes of distributions under the Plan.  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Class 6 of the Plan, which information shall be included in the Notice of the Effective Date.

### 3.9    RELEASE, INJUNCTION AND RELATED PROVISIONS

**3.9.1    Release of Liens**.  Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property subject to the Sale Transaction shall be fully released.

**3.9.2    Liabilities to, and Rights of, Governmental Units**.  Notwithstanding anything to the contrary in the Plan or the Confirmation Order, nothing in the Confirmation Order or the Plan discharges, releases, precludes, or enjoins: (1) any liability to any Governmental Unit that is not a Claim; (2) any Claim of a Governmental Unit arising after the Effective Date; (3) any police power or regulatory liability to a Governmental Unit that any Entity would be subject to as the owner or operator of any property after the Effective Date; (4) the rights of any Governmental Unit with respect to the transfer or assignment of any license, permit, registration, authorization, or approval, in each case, to the extent provided under applicable law; and/or (5) any liability to a Governmental Unit on the part of any Entity.

**3.9.3    Exculpation**.  **Effective as of the Effective Date, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; provided, however, that the foregoing "exculpation" shall have no effect on the liability of any person or Entity that results from any act or omission based on or arising out of gross negligence, fraud or willful misconduct.**

**3.9.4    Releases**

       i.    ***Releases by the Debtors.***    **Pursuant to section 1123(b) of the Bankruptcy Code and to the fullest extent authorized by applicable law, and except as otherwise specifically provided in the Plan, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is expressly, unconditionally, generally and individually and collectively**

**released, acquitted and discharged by the Debtors and their Estates from any and all actions, claims, obligations, rights, suits, judgments, damages, demands, debts, rights, remedies, Causes of Action, and liabilities of any nature whatsoever, including any derivative claims or claims for recharacterization, subordination, or avoidance of the DIP Claims, Prepetition DDTL Secured Claims, Prepetition ABL Secured Claims or any other claim against any Highbridge Party, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Sale, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan or related agreements, instruments or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; _provided_, _however_, that the foregoing releases shall have no effect on (x) the liability of any person or Entity that results from any act or omission based on or arising out of gross negligence, fraud or willful misconduct, or (y) any claim or cause of action that is a Transferred Asset.**

    ii.   _**Consensual Third Party Releases.**_   **Unless such creditor opts out of such release,[6] for good and valuable consideration, the adequacy of which is hereby confirmed, each holder of an Allowed Claim, shall be deemed to forever release, waive, and discharge the Released Parties, other than the Debtors, of all claims, obligations suits, judgments, damages, demands, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever, whether direct or derivative, known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, including, without limitation, any of the foregoing based on**

---

[6] For instructions on how to opt-out of the Consensual Third-Party Release, each claimant should carefully review the voting instructions included in its ballot.

or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Sale, the Global Settlement, the Plan, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan or related agreements, instruments or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to the Debtors; **provided**, **however**, that the foregoing releases shall have no effect on the liability of any person or Entity that results from any act or omission based on or arising out of gross negligence, fraud or willful misconduct; **provided**, **further**, that the releases set forth in this section shall not be deemed a release of obligations owing by any party under the Global Settlement or the UCC Settlement.

3.9.5   **Injunction**.   Except as otherwise provided in the Plan or the Confirmation Order, as of the  Effective Date, all Entities that have held, hold or may hold any Interest in the Debtors or a Claim, Cause of Action,  or other debt or liability against the Debtors or  against any Released Party  that have been released and/or exculpated under the this Plan (the "**Released Claims and Interests**") are permanently enjoined from taking any of the following actions against the Debtors or the Released Parties or their respective predecessors, successors and assigns, subsidiaries, Affiliates, current (as of the Effective Date) directors, officers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accounts, investment bankers, consultants, representatives, and other Professionals solely in their respective capacities as such or any  property of the same, on account of such Released Claims and Interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting any right of setoff (other than setoffs exercised prior to the Petition Date), or subrogation of any kind against any debt, liability or obligation on account of or in connection with or with respect to any Released Claims or Interests; and (c) commencing or continuing in any manner or in any place, any action that does not comply with or is inconsistent with this  provision; **provided**, **however**, that the foregoing injunction shall have no effect on the liability of any person or Entity that results from any act or omission based on or arising out of gross negligence, fraud or willful misconduct.

3.9.6   **Term of Injunctions or Stays**.  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to Bankruptcy Code section 105 or 362 or any order of the Bankruptcy Court, and existent on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation

Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 3.10    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**3.10.1 Conditions Precedent to Confirmation.** It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:  (1) the Bankruptcy Court shall have entered the Confirmation Order; and (2) the Asset Purchase Agreement shall not have been terminated in accordance with its terms.

**3.10.2 Conditions Precedent to the Effective Date**.  It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived:

iii.    the Bankruptcy Court shall have entered the Confirmation Order; provided that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry;

iv.    all documents and agreements necessary to implement the Plan shall have (a) all conditions precedent to the effectiveness of such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements, (b) been tendered for delivery, and (c) been effected or executed;

v.    the Closing of the Sale shall have occurred;

vi.    the Professional Fee Claim Reserve shall have been funded consistent with the terms of the Plan; and

vii.    all actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

**3.10.3 Waiver of Conditions**.    The conditions to Confirmation and Consummation set forth in Article IX.A and B of the Plan may be waived only by prior written consent of the Debtors, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.  Upon the occurrence of all the conditions to Confirmation and Consummation set forth in Article IX of the Plan, the Debtor shall immediately declare the Effective Date and file the Notice of Effective Date.

**3.10.4 Effect of Failure of Conditions**.  Unless expressly set forth in the Plan, if the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, any holders or any other Entity; (2) prejudice in any manner the rights of the Debtors, any holders or any other Entity or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any holder of any Claim or any other Entity in any respect.

### 3.11    MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

**3.11.1 <u>Modification and Amendments</u>.**    Except as otherwise specifically provided in the Plan, with the consent of the Creditors' Committee and/or the Highbridge Parties (in either case, with such consent not to be unreasonably withheld, and solely to the extent that the Creditors' Committee or any Highbridge Party, as applicable, is adversely affected by such modification), the Debtors reserve the right, to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127 and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their rights, with the consent of the Creditors' Committee and/or the Highbridge Parties (in either case, with such consent not to  be unreasonably withheld, and solely to the extent that the Creditors' Committee or any Highbridge Party, as applicable, is adversely affected by such alteration, amendment or modification) to revoke or withdraw, to alter, amend or modify the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

**3.11.2 <u>Effect of Confirmation on Modifications</u>.**    Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to Bankruptcy Code section 1127(a) and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**3.11.3 <u>Revocation or Withdrawal of Plan</u>.**    The Debtors reserve the right, to revoke or withdraw the Plan before the Confirmation Date and to file a subsequent plan, <u>provided</u>, <u>however</u>, that the Debtors may revoke or withdraw the Plan and file a subsequent plan. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (l) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claim or Interest; (b) prejudice in any manner the rights of the Debtors, any holder of a Claim or Interest or any other Entity or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors, any holder or any other Entity; <u>provided</u>, <u>however</u>, the revocation or withdrawal of the Plan or failure to Consummate the Plan shall have no effect on the UCC Settlement or the Debtors' and the Highbridge Parties' obligations thereunder.

### 3.12    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases, the Sale Transaction, the UCC Settlement, the Global Settlement, and the Restructuring Transactions pursuant to Bankruptcy Code sections 105(a) and 1142.  The Bankruptcy Court shall retain non-exclusive jurisdiction to hear any other matter not inconsistent with the Bankruptcy Code.

### 3.13    MISCELLANEOUS PROVISIONS

**3.13.1  Immediate Binding Effect.**  Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors and any and all present and former holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases and injunctions described in the Plan, each Entity acquiring property under the Plan, any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors each of respective successors and assigns of the foregoing persons and Entities.

**3.13.2  Additional Documents.**  On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**3.13.3  Statutory Committee and Cessation of Fee and Expense Payment.**  On the Effective Date, the Creditors' Committee shall dissolve and all of its members, Professionals and agents shall have no further duties, responsibilities, obligations, and authority in connection with the Debtors, the Chapter 11 Cases, the Plan, or its implementation, except with respect to applications for Professional Fee Claims.  The Debtors shall not be responsible for paying any fees or expenses incurred by the Creditors' Committee before or after the Effective Date, other than in connection with applications for Professional Fee Claims, subject to the limitations set forth in Article II.A.2.

**3.13.4  Reservation of Rights.**  Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by the Debtors, with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any of their respective rights with respect to the holders of Claims and Interests or each other before the Effective Date.

**3.13.5  Successors and Assigns.**  The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, if any, of such Entity.

**3.13.6  Notices**.  To be effective, all notices, requests and demands to or upon the Debtors shall be in writing.  Unless otherwise expressly provided herein, notice shall be deemed to have been duly given or made when actually delivered or when received and telephonically confirmed, addressed to the following:

(1)    The Debtors

Pernix Therapeutics, LLC
10 N. Park Drive, Suite 201
Morristown, NJ 07960

Attention:     John A. Sedor, Chief Executive Officer
Telephone:     800-793-2145
Email: jsedor@pernix.com

with a mandated copy (which shall not constitute notice) to:

*Counsel to Debtors and Debtors-In-Possession*
Davis Polk & Wardell LLP
450 Lexington Avenue
New York, New York 10017
Attn:  Eli J. Vonnegut
        Christopher Robertson
Telephone:     212-450-4000
Telecopier:     212-701-5800
Email:         eli.vonnegut@davispolk.com
               christopher.robertson@davispolk.com

Landis Rath & Cobb LLP
919 N. Market Street
Suite 1800
Wilmington, Delaware 19801
 Attention:     Kerri K. Mumford, Esq.
Telephone:     302-467-4400
Telecopier:     302-467-4450
Email:         mumford@lrclaw.com

   **3.13.7**  <u>**Entire Agreement.**</u>  Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

   **3.13.8**  <u>**Exhibits.**</u>  All exhibits and documents included in the Plan are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above, from the Notice, Claims and Balloting Agent's website at <u>http://cases.primeclerk.com/pernix</u> or by downloading such exhibits and documents from the Bankruptcy Court's website at <u>http://www.deb.uscourts.gov</u>. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

   **3.13.9**  <u>**Severability of Plan Provisions.**</u>  If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holdings, alterations or interpretations, the remainder of the terms and provisions of the Plan will remain in full force

and effect and will in no way be affected, impaired or invalidated by such holdings, alterations or interpretations.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent and (3) non-severable and mutually dependent.

        **3.13.10**   **Votes Solicited in Good Faith.**  Once the Confirmation Order becomes a Final Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to Bankruptcy Code section 1125(e), the Debtors and their agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties, individuals or the Debtors will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the Securities offered and sold under the Plan or any previous plan.

        **3.13.11**   **Closing of Chapter 11 Case.**  The Debtors shall promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases that has been fully administered.

        **3.13.12**   **No Admission Against Interest.**  Neither the filing of the Plan, the Disclosure Statement, nor any statement contained therein, is or shall be deemed an admission against interest.  In the event that the Plan is not consummated, neither the Plan, the Disclosure Statement nor any statement contained therein may be used or relied upon in any manner in any suit, action, proceeding or controversy within or outside the Bankruptcy Court involving the Debtors.

        **3.13.13**   **No Waiver.**  Except as otherwise specifically provided herein, nothing set forth in the Plan or the Disclosure Statement shall be deemed a waiver or release of any claims, rights or Causes of Action against any Person other than the Debtors.

        **3.13.14**   **Headings.**  The article and section headings used in the Plan are inserted for convenience and reference only and neither constitutes a part of the Plan nor any manner affects the terms, provisions or interpretation of the Plan.

        **3.13.15**   **Governing Law.**  Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent otherwise provided in the Plan, the rights and obligations arising under the Plan, shall be governed by, and construed and enforced in accordance with the laws of Delaware, without giving any effect to the principles of conflicts of law or such jurisdiction.

        **3.13.16**   **Conflicts.**  Except as set forth in the Plan, to the extent that any provisions of the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Confirmation Order shall govern and control and then the Plan.

**3.13.17  <u>No Discharge.</u>**  Notwithstanding any other provision of the Plan or Confirmation Order, pursuant to Bankruptcy Code section 1141(d)(3), the Debtors will not receive a discharge.

## IV.    <u>FEASIBILITY</u>

### 4.1    FINANCIAL FEASIBILITY ANALYSIS.

**4.1.1  <u>The Bankruptcy Code Standard.</u>** The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless contemplated by the Plan.

**4.1.2  <u>No Need for Further Reorganization of the Debtors.</u>**  The Plan provides for the liquidation or distribution of all of the Debtors' Assets.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

## V.    <u>ALTERNATIVES TO THE PLAN</u>

### 5.1    CHAPTER 7 LIQUIDATION

**5.1.1  <u>The Bankruptcy Code Standard.</u>** Notwithstanding acceptance of the Plan by the requisite number of Creditors of any Class, the Bankruptcy Court must still independently determine that the Plan provides each member of each Impaired Class of Claims and Interests a recovery that has a value at least equal to the value of the distribution that each such Person would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

In chapter 7 liquidation cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior Class receiving any payments until all amounts due to senior Classes have been paid fully or any such payment is provided for: (i) Secured creditors (to the extent of the value of their collateral); (ii) Administrative and other priority creditors; (iii) Unsecured creditors; (iv) Debt expressly subordinated by its terms or by order of the Bankruptcy Court; and (v) Interest holders.

**5.1.2  <u>The Plan is in the Best Interests of Creditors.</u>** The Debtors believe that the Plan satisfies the best interests of creditors test because the Plan provides a greater recovery to the holders of Claims than such holders would receive under a liquidation under chapter 7 of the Bankruptcy Code.  For example, if a Chapter 7 trustee were to be appointed in these cases, he or she likely would require considerable time and incur substantial fees and expenses, including a fee for the trustee in the amount of 3% of the value of all property distributed in the Chapter 7 case and the fees of the trustee's professionals in analyzing the Debtors' cases and assets.  In addition, a chapter 7 case would trigger a new bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7. Fed. R. Bankr. P. 3002(c).  This raises the prospect of additional claims that were not asserted in the Chapter 11 Cases.

Importantly, in these cases, substantially all of the Debtors' assets already have been liquidated through the Sale.  There are only two assets remaining: (1) the $2 million in cash sale proceeds to be used to satisfy the priority and administrative claims as set forth in the Plan and the orderly liquidation of the Debtors' Estates; and (2) the Liquidating Trust Assets, which pursuant to the UCC Settlement, will be liquidated and distributed to holders of Allowed General

Unsecured Claims. The Debtors have few, if any, other assets that could be liquidated for value by a Chapter 7 Trustee, and there would be no preserved Causes of Action for the Chapter 7 trustee to pursue since the Trust Causes of Action are part of the Liquidating Trust Assets per the UCC Settlement. Therefore, there would be no purpose to converting these cases to Chapter 7 and doing so would bring no benefit to Creditors, while imposing significant additional and unnecessary expenses and delays on the Debtors' Estates – thereby negatively affecting creditor recoveries.

Further, the Plan implements the UCC Settlement and contains the Global Settlement, which is highly beneficial to General Unsecured Creditors. Accordingly, the Debtors believe that the Plan provides a greater recovery to the holders of Claims than such holders would receive under a liquidation under chapter 7 of the Bankruptcy Code and therefore is in the best interests of the Debtors' creditors.

### 5.2    ALTERNATIVE PLAN(S)

If the Plan is not confirmed, the Debtors or other Persons could attempt to formulate and propose a different plan. The Debtors believe that the Plan, as described herein, enables holders of Claims or Interests to realize the greatest possible value under the circumstances, and that compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

## VI.    RISK FACTORS

**Holders of Claims or Interests should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement, before making a judgment with respect to voting to either accept or reject the Plan.**

### 6.1    CERTAIN BANKRUPTCY CONSIDERATIONS

Even if all Impaired voting classes vote to accept the Plan and the requirements for "cramdown" are met; the Court may exercise substantial discretion and may choose not to confirm the Plan. Bankruptcy Code section 1129 requires, among other things, that the value of distributions to dissenting holders of Claims or Interests may not be less than the value such holders would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet such requirement, there can be no assurance that the Court will reach the same conclusion.

Any objection to the Plan by a member of a class of Claims or Interests could also prevent confirmation of the Plan or delay such Confirmation for a significant period of time.

If the Plan is not confirmed or is confirmed but does not go effective, it is unclear what distribution, if any, holders of Allowed Claims ultimately would receive with respect to their Claims.

### 6.2    CLAIMS ESTIMATION & CASH AVAILABLE AFTER DISTRIBUTION

There can be no assurance that the estimated amount of Claims and Interests set forth herein are correct, and the actual allowed amounts of Claims and Interests may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions, including, without limitation, that unanticipated proofs of claim are filed against the Estates prior to the Bar Dates and such Claims are either not subject to a valid objection by the Debtors or such objections are overruled by the Bankruptcy Court.

## VII.    <u>CONCLUSION</u>

It is important that you exercise your right to vote on the Plan.  It is the Debtors' belief and recommendation that the Plan fairly and equitably provides for the treatment of all Claims and Interests against the Debtors.  In the opinion of the Debtors, the Plan is preferable to any potential alternatives described in this Disclosure Statement because the Plan provides for a larger distribution to the holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.